569 F.2d 705
 Bernard BERGMAN, Petitioner-Appellant,
v.
Honorable Louis J. LEFKOWITZ, New York State Attorney
General, and the Justices of the Supreme Court of
the State of New York, sitting in New
York County, Respondents-Appellees.
 No. 450, Docket 77-2123.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 4, 1977.
Decided Dec. 19, 1977.
Rehearing and Rehearing En Banc Denied Feb. 1, 1978.
 
 Alan M. Dershowitz, Cambridge, Mass. (Litman, Friedman & Kaufman, Lewis R. Friedman, Jack T. Litman and Herman Kaufman, New York City, of counsel), for petitioner-appellant.
 Arthur G. Weinstein, Sp. Asst. Atty. Gen., New York City (Charles J. Hynes, Deputy Atty. Gen., State of New York, Edward J. Kuriansky and Alain M. Bourgeois, Sp. Asst. Attys. Gen., State of New York, New York City, of counsel), for respondents-appellees.
 Before FRIENDLY, HAYS and MANSFIELD, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 Bernard Bergman, who had been a prominent figure in the New York nursing home industry, petitioned the District Court for the Southern District of New York for habeas corpus relief from a sentence of one year's imprisonment, consecutive to a previous four months' federal sentence, imposed by a New York state judge on a plea of guilty to making unlawful payments to a state legislator in violation of § 77 of the New York Public Officers Law. He contended that the Special State Prosecutor for Health and Social Services had breached a plea agreement and that he was therefore entitled to relief under Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). After an extensive hearing before Judge Goettel wherein Bergman's counsel was permitted to explore every highway and byway,[1] the court denied the petition, and Bergman has appealed. Despite the vehemence of the attack on the trial judge's decision, we affirm.The Facts
 
 
 2
 The facts are stated in detail in Judge Goettel's comprehensive opinion, and we shall limit ourselves to what seem to us to be the essential points. As a result of various New York investigations of nursing homes,[2] the State created a Special State Prosecutor for Health and Social Services. Charles J. Hynes, Esq., became the Special Prosecutor. Grand jury investigations of Bergman were begun both by Mr. Hynes and by the United States Attorney for the Southern District of New York. Both grand juries indicted Bergman and his son on August 5, 1975, the federal grand jury on three counts involving the filing of false tax returns, three counts of submitting false Medicaid claims, four counts involving fraudulent statements to the Federal Government, and one count of conspiracy to defraud the Government and commit the offenses stated above, the New York grand jury on one count of conspiracy, four counts of filing fraudulent reimbursement claims, four counts of larceny, and one count of obstruction of governmental administration. Extended negotiations with the two prosecutors led to plea agreements, evidenced in separate letters dated March 4 and 8, 1976. The letter of the Special Prosecutor is reproduced in full in the margin;[3] paragraphs 4 and 8 are of particular importance to this appeal. The letter of the United States Attorney conformed mutatis mutandis.
 
 
 3
 On March 11, 1976, Justice Aloysius J. Melia, in the Supreme Court for New York County, accepted Bergman's plea of guilty to a later state indictment charging him with making unlawful payments to a state legislator in violation of § 77 of the Public Officers Law. He explained to Bergman, as he had earlier done to counsel in chambers, that while he ordinarily accepted a prosecutor's recommendation for less than the maximum sentence and saw no reason "at this point in time to believe that I would not do so here," he wanted "it to be very clear to you that on this plea of guilty you could be sentenced to serve up to four years regardless of what sentence is imposed in the Federal Court."[4] Not until Bergman thrice acknowledged that he understood this was the guilty plea accepted. On the same day the plea bargain was presented to Judge Frankel in the federal court and the guilty plea was accepted there. Bergman read a written statement in which he admitted knowing that his accountant was withdrawing money from Towers Nursing Home and paying it to his own account; that false information was being given to the Department of Health which got Towers a higher rating than it deserved; that a salary was being paid to Bergman's wife, for which she performed no work; that interest charges for real estate entities in which Bergman had an interest were improperly submitted to the Health Department as costs of Towers; and that he sold partnership interests in Towers to certain persons, caused them to be made partners of a company performing cleaning services for Towers, and failed to disclose the facts of the relationship in his tax returns.
 
 
 4
 A dispute shortly arose between Bergman and the Special Prosecutor concerning paragraph 8 of the plea bargain, relating to restitution. The Special Prosecutor in May 1975 claimed that Bergman's liability was at least $2,500,000. Bergman attacked that figure, but did not present one himself until criticized by Judge Frankel for the omission on June 10. Four days later defense counsel submitted materials that placed Bergman's liability at only $363,877. Further, the Special Prosecutor insisted that the amount be determined and paid prior to sentencing; Bergman's counsel favored sentence first and payment later. Although the plea bargain was not as specific about this as it should have been, common sense would dictate in favor of the Special Prosecutor's construction that restitution should be provided for, at least before sentencing in the state court; Bergman would have had little incentive to make restitution once he had served his sentence and the prosecutors had carried out the rest of the plea bargain.[5] This dispute was brought to the attention of both judges during June. Justice Melia indicated that he would not be prepared to sentence until the differences with respect to restitution were resolved or a machinery for their resolution was established. Any interval between the federal and the state sentencing was a subject of concern to defense counsel.[6] When the parties applied for a postponement of the federal sentencing corresponding to any delay in the state sentencing, Judge Frankel declined on the basis that sentencing had already been delayed too long. He noted later that he regarded the restitution problem as a matter solely of state concern and that he would proceed on the assumption that no additional sentence would be imposed by the state court.[7]
 
 
 5
 On June 17, 1976, Judge Frankel sentenced Bergman to four months' imprisonment. Bergman distributed to the press on the courthouse steps a prepared statement saying that "Irrespective of whether today's sentencing decisions are resolved favorably or not, I am relieved that this ordeal of more than 1 and 1/2 years is over. It is finally time that the air is cleared and that the truth emerges," and that, "Approximately 99% Of the amount charged in the indictments and in other demands made by the Prosecutors concerned matters which I knew nothing about. They were entirely the account(ant)'s own overaccruals and misclassifications." Counsel then returned to Justice Melia. Despite the Justice's statements on June 15 and 16 that he would not sentence while the restitution controversy remained unresolved, Bergman's attorney asked him to do so.[8] Justice Melia again refused. He repeated that he had no commitment to follow the Special Prosecutor's recommendations and emphasized that the people were entitled to know "how much money is due and owing to them from these Medicare discrepancies" and "to be paid back that money." He adjourned the sentencing to July 2, 1976. On leaving the state court Hynes answered some questions from reporters and said he would make a formal press statement in his office later in the day. We quote this in full in the margin.[9] This statement was reported both on radio and television and in the press, and we have no doubt that Justice Melia became aware of it.
 
 
 6
 As found by the district judge, "Public response to the sentence was immediate, substantial and generally adverse." The negative response was predictable in view of the widespread publicity concerning grave abuses in nursing homes, see note 2 supra, and was doubtless accentuated by the sentence having followed upon another federal judge's imposition of a suspended sentence, with confinement only on weeknights, on Eugene Hollander, another nursing home proprietor who had figured prominently in the state investigations. The New York Times, which printed a balanced news account along with excerpts from Judge Frankel's sentencing memorandum and the full text of Hynes' press statement, also published an editorial which opined that the sentence made "the odds on white-collar crime look rather good" and could "only reinforce cynicism about the realities of equal justice under law." The New York Post, paying deserved tribute to Judge Frankel as "a thoughtful, conscientious judge," was concerned whether the Hollander and Bergman sentences established "any serious deterrent to new nursing home fraud." The Daily News spoke more raucously of "powder-puff treatment."[10] Assemblyman Stein, who had chaired one of the State investigations of nursing homes, voiced his indignation to the press and later wrote and called upon Justice Melia to urge a higher sentence; concededly the Special Prosecutor had no part in this.
 
 
 7
 On July 2, the Special Prosecutor and Bergman's counsel again appeared before Justice Melia. Mr. Hynes asked the Justice to defer the sentencing since Bergman had not fully complied with the provisions of the plea agreement relating to restitution in respect either of amount or method of payment. The amount Bergman conceded that he owed had inexplicably quadrupled from the $360,000 claimed at the proceedings in mid-June to $1,400,000 but the state was adhering to its figure of $2,500,000 at minimum and to its demand that payment be tendered before sentencing. Defense counsel agreed to submit to a binding determination of the amount due but disclaimed any obligation by Bergman to pay before sentence, which he asked to have imposed immediately. Justice Melia made an extended statement: He reiterated his amazement at learning on June 17 that "nothing had really been accomplished" with respect to restitution. In fairness to the defendant he had then deferred sentence to enable some progress to occur. Later the judge had indicated that he was agreeable to a suggestion that the amount be determined by a top accounting firm, but he had insisted that a substantial down payment be made prior to sentencing. The judge was willing to extend the date of sentencing until September to afford a further time for working out restitution but if Bergman wished to be sentenced immediately, he would proceed forthwith.
 
 
 8
 These remarks, with their evident overtone, provoked a quick reaction. Defense counsel advised the judge that he had suddenly learned that Bergman "is not feeling able to present himself to this Court in the posture he would like to, both physical and psychological reasons." He therefore joined in the Special Prosecutor's application for an adjournment. The judge was understandably puzzled why Bergman should not be ready for sentence if he was "five minutes ago." After a brief recess to permit consultation with Bergman, counsel asserted that he had been at fault in asking for immediate sentence and repeated that he now joined the Special Prosecutor's request for an adjournment. The court agreed. Justice Melia noted that he would require not only a determination of the amount but also a substantial payment and an acceptable program of payment. He made clear that this would be the last adjournment and that he was "not tied to any sentence agreement with anybody." He also revealed that Assemblyman Stein had called upon him and deplored that this had been "trumpeted to the press in advance." Sentencing was set for September 14, 1976.
 
 
 9
 On September 14 the Special Prosecutor addressed the court. He reported that, with respect to cooperation, see paragraph 5 of the plea bargain, note 3 supra, Bergman had "substantially complied and continued to comply." With respect to restitution there had been more than 30 meetings since July 2. At earlier meetings Bergman's admissions of liability rose from $1,400,000 itself four times his original figure to slightly more than $2,000,000. Still not satisfied, the Special Prosecutor had obtained the appointment of an accounting firm as arbitrator. "Almost immediately, the defendant agreed to repay.$2.5 million . . .," now seven times his starting figure and what the State had insisted on from the beginning. Difficulties had persisted, however, on the question of the method of payment. Now, "at the eleventh hour," Bergman had complied with a suggestion of the arbitrator and had signed a confession of judgment for $2,500,000 and assigned all his assets to the State as security. The Special Prosecutor continued:
 
 
 10
 Since both items of the agreement have now been satisfied, I have the obligation to fulfill my commitment under the March 4th agreement and, your Honor, would recommend that whatever sentence you impose be a concurrent one with the Federal sentence imposed on June 17, 1976.
 
 
 11
 Hynes then adverted to the difficulties he had encountered in obtaining restitution and warned that if there should be any failure or subversion by Bergman that prevented the State from recovering the full amount owed, he would declare the remaining portion of the plea bargain null and void. He emphasized that Bergman was being sentenced only for violation of § 77 of the Public Officers Law. Finally,
 
 
 12
 . . . it is in recognition that the agreement was complied with by the defendant, both areas, cooperation and restitution.
 
 
 13
 I made the recommendation I was required to make.[11]
 
 
 14
 Defense counsel immediately sought a clarification, and the following colloquy occurred:
 
 
 15
 Mr. Hynes, if I understood him correctly, indicated that his obligation as he viewed it under the terms and conditions of the plea agreement was that any sentence imposed by your Honor be concurrent.
 
 
 16
 I am now looking at Paragraph 4 of the plea agreement, your Honor, and as I read the language and obviously as I construe the language I view for want of a better word perhaps his obligation to be a recommendation that no sentence additional to that imposed by the United States District Court judge on the Federal indictment be posted here.
 
 
 17
 Mr. Hynes: That is my recommendation.
 
 
 18
 Mr. Newman: I think you, Mr. Hynes. That makes that question academic to your Honor.[12]
 
 
 19
 Counsel proceeded with a plea that Bergman had suffered enough, and Bergman left himself "to the mercy of the Court."
 
 
 20
 Justice Melia began his sentencing remarks by observing that Bergman was to be sentenced for violation of § 77 of the Public Officers Law, a felony which carried a maximum of four years imprisonment. Sentencing required analysis both of the crime committed, one which "smacks of corruption in that the defendant attempted with corrupt intent to influence a state legislature[13] to exert certain pressure to have his Park Crescent Nursing Home application approved for operation" and of the person who committed it. He referred to the great volume of contradictory recommendations he had received and to the plea agreement. Adverting to the history of the efforts to secure restitution and the previous sentencing hearings which we have recounted, he stated that it was "disconcerting" to him that three months after the guilty plea, the defense had not calculated what was owed. He further characterized the original $364,000 offer as again "a heavy case of foot dragging" and said that he had "not been greatly impressed by the defendant's good faith in the resolution of the issue." His "very strong conclusion" was that a solution "was only brought about as a result of the process and the impending sentence. . . ."
 
 
 21
 The judge then recounted the Special Prosecutor's recommendations that favorable consideration be given to Bergman for the restitution agreement, that the indictment against Bergman's son be dismissed, that the original state indictment against Bergman be dismissed, that no further prosecutions be brought against Bergman or his family and, most importantly for this appeal, that no jail sentence additional to that fixed by the federal court be imposed. He referred to his own frequent iterations that he had "agreed to give great consideration to the Special Prosecutor's recommendation pursuant to this agreement with the defense but not to be bound by it" and announced that "history and legal tradition impels a court to give a Prosecutor's recommendation for a lesser sentence great weight." He repeated his characterizations of the corrupt nature of the crime and of "what I believe to be shilly shally on the amount of money owed to the People of the State and which was provided to be resolved in the plea bargain. . . ." He found that Bergman showed "little or no remorse" but rather "a consuming interest in the preservation of his unearned gains," and he objected to Bergman's attempt to place the blame on overzealous underlings. Taking into account the recommendation of the Special Prosecutor and the financial arrangements that had been made, in lieu of imposing the maximum sentence of four years the court imposed a sentence of one year, consecutive to the federal sentence.
 
 
 22
 After serving his federal sentence Bergman appealed his state sentence to the Appellate Division, claiming that Hynes had not complied with his recommendation that there be no additional sentence. The Appellate Division affirmed unanimously without opinion, 57 A.D.2d 749, 395 N.Y.S.2d 872 (1977); leave to appeal to the Court of Appeals was denied, 42 N.Y.2d 890, 397 N.Y.S.2d 1031, 366 N.E.2d 885 (1977).[14]
 
 
 23
 The final act in the state courts was an application by Bergman for a reduction in sentence pursuant to C.P.L. § 430.10. The Special Prosecutor opposed this and Justice Melia denied it on June 23, 1977. After Mr. Justice Marshall had denied an application for a stay or bail under the state sentence, the petition for federal habeas was filed on July 8, 1977. Bergman has been allowed to remain at large pending its consideration in the district court and here.
 
 Discussion
 
 24
 Bergman's contention that the Special Prosecutor violated the plea bargain has three facets, the first two being closely related. First, it is claimed that Hynes' conduct immediately after the federal sentence and the publicity attendant on it destroyed his ability to comply in good faith with his obligation to recommend that the state judge impose no additional sentence. Second, it is contended that in fact he did not make a good faith recommendation at the hearing before Justice Melia on September 14, 1976. Finally, it is claimed that the opposition to Bergman's motion to reduce the sentence was a further breach of the agreement.
 
 
 25
 Admittedly the plea bargain did not expressly prohibit the Special Prosecutor from commenting on the federal sentence.[15] Still it is not unreasonable to read into the agreement an implied term that the Special Prosecutor would not comment on the federal sentence in a manner that would constitute a reneging on his obligation to recommend that the state judge impose no additional sentence or make it practically impossible for the state judge to accept such a recommendation. He did neither. Nothing in the press release or in other statements to the press, see note 9 supra, afforded any indication that Hynes would not perform his agreement to recommend no additional sentence if Bergman complied with the as yet unperformed covenant to make restitution or that he hoped the state judge would reject any such recommendation. Indeed the press statement makes no reference at all to the forthcoming state sentence.
 
 
 26
 While the release surely did nothing to dampen the media's criticism of the federal sentence, there is no proof that it significantly contributed to this. The sentencing had been widely attended by the press and, for reasons already indicated, its reaction was expectable. If there were any intimations in the release that Hynes might no longer be bound by the plea agreement, they were founded on Bergman's foot-dragging with respect to restitution a position Hynes had every right to take.[16]
 
 
 27
 This brings us to the second argument. Admittedly Hynes made the recommendation he had promised to make. The claim is that he did this grudgingly or, as Judge Goettel stated, "tepidly". This is said to follow from his use of the words "I have the obligation to fulfill my commitment" and "I made the recommendation that I was required to make."
 
 
 28
 We perceive no dispositive significance in this. In almost all cases where a prosecutor agrees in a plea bargain to make a sentence recommendation, he is recommending not what he wants but something less, which the agreement requires. This is the very essence of the bargain and the sentencing judge is well aware of it. We thus see nothing sinister in Hynes' stating that he was acting in pursuance of the plea agreement unless something in his facial expression or his tone indicated to the judge that he would prefer not to have his recommendation accepted. There is no evidence to that effect. Moreover, the best proof that this did not occur is defense counsel's expression of thanks for Hynes' statement. Any reservations expressed by the Special Prosecutor related to Bergman's tergiversations about restitution; these having been resolved at the eleventh hour, Hynes proceeded to do what he had agreed to do. The judge, who had made clear from the outset that he would not be bound by the Special Prosecutor's recommendation, indicated three times at the sentencing that he was giving it substantial weight. His stated reasons for imposing a sentence additional to the federal sentence were not at all a view that the latter was inadequate for the federal crimes to which Bergman had pleaded guilty, a matter which he apparently and properly considered not to be his concern, but his belief in the seriousness of the state crime to which the federal judge admittedly had given little consideration, see note 7 supra, and developments subsequent to the federal sentence, namely, Bergman's efforts to avoid restitution, of which the federal judge in the nature of things could not have been aware.
 
 
 29
 The case thus differs totally from Snowden v. State, 33 Md.App. 659, 365 A.2d 321 (1976), where a presentence report proposed a higher sentence than had been bargained for and the prosecutor did not sufficiently indicate his disagreement with the proposal and even subtly promoted it, and from other state and federal cases in which the prosecutor promised to make no sentence recommendation but then proceeded to condemn the defendant's conduct.[17] It differs equally from our decision in Palermo v. Warden, 545 F.2d 286 (2 Cir. 1976), cert. dismissed, 431 U.S. 911, 97 S.Ct. 2166, 53 L.Ed.2d 221 (1977), where, as the district court was held to have permissibly found, the prosecutors induced the defendants to plead guilty to a robbery charge by representing that they would receive parole after one year in prison; that the prosecutors knew they had no such assurances from the Parole Board; and that the prosecutor not only breached his agreement to take all possible steps to achieve an early parole but took steps that diminished the chance of this. Bergman's experienced trial counsel had full knowledge that Justice Melia would not agree to be bound by the Special Prosecutor's recommendation of no additional sentence; Hynes' obligation was simply to urge this in good faith. The only decision that gives Bergman even a modicum of support is Judge Winter's opinion for a divided panel in United States v. Brown, 500 F.2d 375 (4 Cir. 1974). This, like Santobello, was a case where at the sentencing hearing the Government was represented by a prosecutor different from the one who had negotiated the agreement, which had been fully explained to the judge when taking the guilty plea. Judge Winter regarded the new prosecutor's statement that he had "some problems" with the plea agreement and his inability to explain it to the judge as having "effectively undercut the agreement before defense counsel even began to speak." 500 F.2d at 378. Here we see no more basis for concluding that Hynes "effectively undercut" his agreed recommendation than did defense counsel who thanked him for it. If counsel had wished Hynes to add some adverbs such as "unreservedly," see Chief Judge Haynsworth's dissent in Brown, 500 F.2d at 379, or "sincerely" or "unequivocally," we have no doubt he would have done so, but there was no need for this. We would not regard a rule permitting a plea bargain to be avoided as a denial of due process because of lack of adequate gusto in a prosecutor's recommendation, particularly when this is discerned by defense counsel only after a disappointing sentence, as promoting the sound administration of criminal justice.[18]
 
 
 30
 Finally we reject the contention that at the September 14 sentencing Justice Melia was necessarily hearing not what Hynes was saying to him in open court but what Hynes had said to the press after Judge Frankel's sentence three months before. There is no need to repeat our previous discussion beyond stating that Hynes had said nothing to the press which either expressly or by fair inference conveyed the idea that, because of his disappointment with the federal sentence, he would renege on the plea agreement if Bergman complied with it; that he labored mightily to secure such compliance; that once he had brought this about, he lived up to his agreement to recommend no further sentence; and that there is not a shred of evidence that anyone in the September 14 proceedings gave weight to what had transpired three months before.
 
 
 31
 Bergman's third argument, that the Special Prosecutor violated the plea agreement by opposing the motion to reduce sentence after the affirmance by the Appellate Division, requires little discussion. The plea agreement bound the Special Prosecutor to recommend in good faith that Justice Melia impose no additional sentence. Before accepting the agreement the judge had placed everyone on notice that he might decide not to follow that recommendation, and the agreement did not require the Special Prosecutor to join in any appeal or postconviction proceeding with respect to any additional sentence so imposed. Bergman's entitlement in such proceedings was simply that the Special Prosecutor should not cast doubt on his recommendation; Hynes did not. The case is thus readily distinguishable from United States v. Ewing, 480 F.2d 1141 (5 Cir. 1973), where the Government agreed not to oppose a probated sentence and then did precisely that on a Rule 35 motion.
 
 
 32
 In view of our holding that the Special Prosecutor committed no breach of the plea agreement, we have no occasion to consider the State's contention that if Bergman considered the plea bargain to have been breached by Hynes' press release and conference, he should have moved immediately for leave to withdraw his guilty plea or Bergman's arguments against this. We likewise need not consider whether on any view we could grant what counsel terms "specific performance" of the agreement, namely, the voiding of any additional state sentence, as distinguished from what the Supreme Court evidently meant by that phrase, see Santobello, 404 U.S. at 263, 92 S.Ct. 495, resentencing by another state judge.
 
 
 33
 The judgment denying the petition for a writ of habeas corpus is affirmed.
 
 
 
 [1]
 Judge Goettel later stated in his opinion, fn. 2, that "The need for such an extensive hearing was questionable since, concededly, the essential facts were not in dispute." Among the byways was lengthy investigation of discussions within the Special Prosecutor's staff concerning the proposed press release and the statement to be made at the state sentencing which are hereafter discussed. We see little relevance in all this. The Special Prosecutor does not deny he is responsible for what he did. This either was or was not a violation of the plea bargain, and it is immaterial how far he was advised to do something different
 
 
 [2]
 The most recent of these were the Report of the New York Temporary State Commission on Living Costs and the Economy and an elaborate report in April 1976 by a Moreland Act Commission on Nursing Homes and Residential Facilities created by Governor Carey's Executive Order # 2 of January 10, 1975. The tenor of the report can be gleaned from the titles of the seven volumes: Regulating Nursing Home Care: The Paper Tigers; Reimbursement of Nursing Home Property Costs: Pruning the Money Tree; Political Influence and Political Accountability: One Foot in the Door; Nursing Homes and Domiciliary Facility Planning: Decisions on the Back of an Envelope; Reimbursing Operating Costs: Dollars without Sense; Assessment and Placement: Anything Goes; Long Term Care Regulations: Past and Future Prospects (Summary Report). Although Bergman's name figured prominently in the volume on Political Influence, the Commission's devastating criticisms included most of the industry and its regulators, both state and municipal
 
 
 [3]
 (LETTERHEAD OF)
 STATE OF NEW YORK SPECIAL STATE PROSECUTOR FOR HEALTH AND SOCIAL SERVICES 270 Broadway, New York, N. Y. 10007 (212) 488-2600
 March 4, 1976
 Nathan Lewin, Esq.
 Gustave Newman, Esq.
 
 
 [522]
 Fifth Avenue
 New York, New York 10036
 Gentlemen:
 This will confirm the agreement that has been made between the Office of the Special State Prosecutor and Bernard Bergman and Stanley Bergman in connection with Indictment 3741/75.
 
 
 [1]
 Bernard Bergman will plead guilty to counts 1 and 3 of The Federal Indictment, 75 Cr. 785, in the United States District Court for the Southern District of New York
 
 
 [2]
 Bernard Bergman will plead guilty to a one count State indictment charging him with making unlawful payments to Albert Blumenthal, in violation of Section 77 of the New York Public Officers Law
 
 
 [3]
 Following the sentence of Bernard Bergman on this plea to making unlawful payments to Albert Blumenthal, the State of New York will dismiss Indictment 3741 75 against the defendants Bernard Bergman and Stanley Bergman. It is understood that the Special Prosecutor has agreed to the dismissal of this indictment because (1) the charges to which Bernard Bergman has pleaded guilty in the United States District Court and for which he will be sentenced by a United States District Court Judge are similar to those contained in this State indictment; (2) Bernard Bergman has truthfully admitted his actions and pleaded guilty to the charge of violating Section 77 of the Public Officers Law; and (3) Stanley Bergman's role in the events that are the basis of the charges in this State indictment consists of acts done at the general direction of Bernard Bergman, are relatively of an insubstantial nature and the interests of justice would not be served by further prosecution of Stanley Bergman
 
 
 [4]
 The Special State Prosecutor will recommend to the Judge of the New York State Supreme Court who will sentence Bernard Bergman on his plea of guilty to making unlawful payments to Albert Blumenthal that, in light of Bernard Bergman having voluntarily disclosed the facts of the crime to the Special Prosecutor and since the Federal Judge will know of these facts when he imposes sentence on the Federal charges, no sentence additional to that imposed by the United States District Court Judge on the federal indictment be imposed here
 
 
 [5]
 Bernard Bergman and Stanley Bergman and members of their families will cooperate with the Office of the Special State Prosecutor and the United States Attorney's Office
 
 
 [6]
 Bernard Bergman and Stanley Bergman and their immediate families will be forthright, honest, and completely truthful. This entire agreement will become null and void if, in the good-faith judgment of either the United States Attorney's Office or the Office of the Special State Prosecutor, after a full discussion of the matter with counsel for Bernard Bergman and Stanley Bergman, it is determined that either Stanley Bergman or Bernard Bergman or their immediate families have not been forthright, honest or completely truthful
 
 
 [7]
 No further criminal prosecution will be brought against Bernard Bergman or his immediate family for any acts occurring prior to the date of this agreement unless such acts involve violence or the sale of narcotics. To this end, Bernard Bergman and his immediate family will be permitted to testify before the Grand Jury without waivers of immunity
 
 
 [8]
 Bernard Bergman will pay to the State of New York, voluntarily, without any civil action or litigation of any kind, whatever sums of money are owing to the State of New York from the Towers Nursing Home and any other nursing homes in which he has an interest arising out of Medicaid payments
 This amount shall be determined after consultation and examination of all financial and business records and documents by and between accountants representing the United States, the State of New York, and Bernard Bergman.
 
 
 [9]
 The sentence of Bernard Bergman on his plea of guilty will take place after the United States District Court Judge has imposed sentence and there is a final judgment of conviction. The parties will seek to have that sentence take place after the termination of all proceedings in which the testimony of Bernard Bergman is required
 
 
 [10]
 Consistent with the practice in the Federal Court, the Special Prosecutor and the Federal Prosecutor will not recommend a specific sentence to the Federal Judge or to the Probation Department. However, the Special Prosecutor will make a submission of facts to the Federal Judge and the Probation Department which will set forth all of the testimony and documents relating to the activities of Bernard Bergman that have been revealed by its investigation and will compare this evidence with the factual charges made against Bernard Bergman in 1974 and early 1975. The Special Prosecutor will not make any statement characterizing the crimes to which Bernard Bergman has pleaded guilty. The Special Prosecutor will tell the Federal Judge and Probation Department the nature, extent and value of the cooperation of Bernard Bergman and his family
 Very truly yours,
 /s/ CHARLES J. HYNES CHARLES J. HYNES Special State Prosecutor
 
 
 [4]
 A state judge to whom Bergman's case had earlier been assigned had refused to go along with a proposed plea agreement that would have committed him to impose no sentence in addition to that imposed by the federal court
 
 
 [5]
 Justice Melia said of Bergman's argument concerning the method of payment:
 Now, I was shocked, chagrined, surprised and displeased when I read in defense memoranda with respect to sentence, an observation that the defense took a dim view of the position taken by the prosecutor, in that there was no time mentioned in the agreement. . . . It is shocking to me to think that counsel would say "Well, sentence will be imposed, and maybe in the year 2010 we will get around to determining how much is due and owing and how much will be paid."
 Well, I let counsel know yesterday that that is not going to happen here. That is not going to happen.
 Bergman's counsel now suggests that restitution could have been made a condition of probation after the end of any state prison sentence. But this would have led to lengthy hearings on revocation of probation. Moreover, the Special Prosecutor could not have recommended an additional term of probation consistently with the plea agreement.
 
 
 [6]
 At one point in his opinion, Judge Goettel stated that "an implicit, although unwritten, term of the plea bargain agreement was that both sentences would be handed down on the same day." At another point, however, he found that sentencing on the same day was "an aim not a promise." Our view of the record leads us to believe that the second statement is the more accurate. In any event it must have been obvious that even an agreement for simultaneous sentencing could not bind the judges
 
 
 [7]
 Judge Frankel was informed that the state judge would not consider himself bound by the Special Prosecutor's recommendation of no additional sentence but would not disregard it. Judge Frankel also stated that although he knew that his sentence was supposed to encompass the charge of bribing Assemblyman Blumenthal, to which Bergman had pleaded guilty in the state court, he was not disposed to give much weight to it in view of the state court's dismissal of the charge against the Assemblyman and since the bribe was a state, not a federal matter. He had earlier said that if the state judge did impose an additional sentence, he would entertain an application by Bergman for reconsideration. See also United States v. Bergman, 416 F.Supp. 496, 504 (S.D.N.Y.1976)
 
 
 [8]
 The Special Prosecutor urged the court to postpone sentencing so that the plea agreement might be salvaged. In light of our finding that the Special Prosecutor reasonably determined Bergman to be in breach of the plea agreement at that time, see note 9 infra, and of Judge Goettel's finding that sentencing on the same day was "an aim (and) not a promise," see note 6 supra, we see no impropriety in that request. In any event it is plain that the request was without consequence; Justice Melia had already made perfectly clear what his intentions were
 
 
 [9]
 I am extraordinarily disappointed by the sentence that Dr. Bergman received today. One wonders whether essential justice has been accomplished when a man such as Bernard Bergman is given this kind of sentence
 I am deeply troubled and discouraged by the cynicism generated by what the people consider to be a special justice for the privileged.
 I am also saddened about what our elderly must think . . . those who lived in one of Bernard Bergman's nursing homes. I believe they must feel abandoned and alone once again.
 As for those destined to spend time in a nursing home in their later years one out of every five elderly Americans will do so what are they to think?
 Our continued investigation into the nursing home industry may, I fear, be adversely affected by this sentence. Concerned citizens, families and employees in nursing homes where stealing and abuse is going on today may now think twice before cooperating with my office.
 Morris Abram, in his Moreland Commission report to the Governor, prophesied that if vigilance wasn't exercised we could face a repeat of the nursing home scandal in 5 or 10 years.
 The sentence handed to Bernard Bergman today does little to belie the fears expressed by Mr. Abram.
 New York has done more than any other state to correct its nursing problems: millions of dollars and vast amounts of manpower have been poured into the task of cleaning up the nursing home industry.
 If all this money and effort is not to be wasted, then those who have abused the elderly and, in so doing, fashioned for themselves a life of luxury, must learn that they will go to jail for their crimes.
 However, insubstantial prison sentences do not deter me. I shall continue to vigorously investigate and prosecute criminals who thrive on abuse of our elderly citizens.
 Appellant also refers to an oral statement by Hynes at the press conference, in response to an undisclosed question, that he considered the plea bargain a nullity and was no longer bound to request that Justice Melia imposed a concurrent sentence, or to refrain from further investigation or from prosecution of Stanley Bergman. We are more confident than Judge Goettel that the question was hypothetical and the response, thus, conditional. Since Hynes had stated in court that the agreement would be a nullity if no further action were taken by Bergman and moved to postpone sentencing to afford an opportunity for such action, it would seem unlikely that he would almost immediately thereafter repudiate the agreement. He testified that he did not do so and that his statement was conditional. Further, none of the newspaper articles introduced by Bergman report an outright repudiation of the agreement. When one radio report replayed the language in question, the lead-in was that Hynes had stated the prosecutor's part of the deal would be off unless Bergman agreed to make restitution, and a television report prefaced the language by noting that the restitution dispute threatened to undo the plea agreement.
 Even if the statement is not taken as conditional, Hynes had already made clear in the state court that he considered the plea bargain to have been breached by Bergman's insistence that he owed only $360,000 by way of restitution as against the State's figure of $2,500,000 and persisted in that position until, as appears below, Bergman accepted the State's figure and provided a method of payment under the gun of being sentenced by the state judge, who had expressed distaste at the long delay in settling the restitution issue. This was a tenable position and we thus see no warrant on any basis for appellant's counsel's characterizing Hynes' oral statement at the press conference as "an unmistakeable violation of the plea bargain." (Brief p. 6).
 
 
 [10]
 Needless to say, we cite these editorials only because they are a part of appellant's argument
 
 
 [11]
 Although the transcript prints these as two separate sentences, it seems clear that they were one
 
 
 [12]
 It is not disputed that "think" should read "thank"
 
 
 [13]
 Of course, this should read "legislator"
 
 
 [14]
 The State has suggested that insofar as Bergman's habeas petition depends on Hynes' press release and press conference, state remedies may not have been exhausted since the Appellate Division refused to consider extra-record material. However, both parties prefer that we decide the entire case with respect to violation of the plea bargain and we shall do so. To require further state proceedings "might well invite the reproach that it is the prisoner rather than the state remedy that is being exhausted." United States ex rel. Kling v. LaVallee, 306 F.2d 199, 203 (2 Cir. 1962) (concurring opinion). We therefore exercise our discretion not to require these. Cf. Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); United States ex rel. Graham v. Mancusi, 457 F.2d 463, 468 (2 Cir. 1972); United States ex rel. Ellington v. Conboy, 459 F.2d 76, 79 (2d Cir. 1972)
 
 
 [15]
 Issuance of the statement is said to have violated Disciplinary Rule 7-107(E) of the New York Code of Professional Responsibility which provides that an attorney associated with the defense or prosecution of a criminal case may not make an extrajudicial statement if it is to be expected that it will be disseminated and if it is reasonably likely to affect the imposition of sentence. Hynes' statement clearly could not affect Judge Frankel's imposition of sentence, which had already occurred. The argument is rather that a foreseeable consequence of the statement was that it would affect Justice Melia's imposition of sentence. Except insofar as this contention blends into the argument, hereafter considered, that Hynes' statement made it impossible for him to live up to the plea agreement, a possible violation of the State Disciplinary Rule is not of constitutional magnitude so as to be cognizable in federal habeas
 
 
 [16]
 We thus find People v. Kaanehe, 19 Cal.3d 1, 136 Cal.Rptr. 409, 559 P.2d 1028 (1977), upon which appellant's counsel relies, to be completely inapposite. There, a prosecutor who was bound "at the time of the imposition of judgment and sentence (to) give up (the) right to recommend or argue disposition of the case," 136 Cal.Rptr. at 416 n.7, 559 P.2d at 1035 n.7, called upon the sentencing judge in chambers the day before to argue for a jail sentence and wrote a letter to the Department of Corrections, with a copy to the judge, criticizing the probation officer's recommendation for underestimating the seriousness of the crime
 
 
 [17]
 In Miller v. State, 272 Md. 249, 322 A.2d 527 (1974), the prosecutor informed the court that he was not "in full compliance (sic) with the recommendation of the Probation Officer," 322 A.2d at 529, which urged a light sentence. In Commonwealth v. Alvarado, 442 Pa. 516, 276 A.2d 526 (1971), the prosecutor gave an impassioned speech concerning the defendant's remorselessness and the viciousness of his crime. In Barnhart v. State, 34 Md.App. 632, 368 A.2d 1124 (1977), the government attempted to refute defense counsel's argument that the defendant's alcoholism mitigated the seriousness of the crime, concluding, "The State considers it a most serious case." 368 A.2d at 1126. Of similar import is United States v. Crusco, 536 F.2d 21 (3 Cir. 1976), where the prosecutor rose to counter what he regarded as factual inaccuracies in defendant's plea for leniency, emphasizing the defendant's importance in organized crime and the size of his drug transactions. In this case and others cited by Bergman, People v. Kaanehe, supra, 19 Cal.3d 1, 136 Cal.Rptr. 409, 559 P.2d 1028; Burroughs v. State, 30 Md.App. 669, 354 A.2d 205 (1976); State v. Witte, 245 N.W.2d 438 (Minn.Sup.Ct.1976), the prosecutor violated an express duty to remain silent, making comments that could well be interpreted as a recommendation of a particular sentence. Here, the prosecutor complied with the express terms of the plea bargain by making the appropriate recommendation. Whether the omission to show the enthusiasm petitioner thinks to be demanded constitutes a Santobello violation is a subject on which these cases shed no light
 
 
 [18]
 Even were we to rule otherwise, we could not find that the plea rested "in any significant degree," Santobello v. New York, supra, 404 U.S. at 262, 92 S.Ct. 495, on an understanding that the prosecutor would use enthusiastic language in recommending no additional prison sentence, particularly in view of the number of important provisions of the agreement with which there was full compliance by him. Cf. United States v. Podell, 519 F.2d 144, 149 (2 Cir.), cert. denied, 423 U.S. 926, 96 S.Ct. 270, 46 L.Ed.2d 252 (1975)