585 F.2d 1171
 Bankr. L. Rep. P 67,001
In Matter of Bernard BERGMAN d/b/a Park Crescent Nursing
Home, Debtor.
CHASE MANHATTAN MORTGAGE AND REALTY TRUST, Plaintiff-Appellant,
v.
Bernard BERGMAN d/b/a Park Crescent Nursing Home,
Defendant-Debtor-Appellee.
 No. 861, Docket 78-5007.
 United States Court of Appeals,
Second Circuit.
 Argued April 13, 1978.
Decided Oct. 13, 1978.
 
 Richard F. Levy, Chicago, Ill. (Howard A. Tullman, Theodore L. Freedman, Steven C. Dupre, Levy & Erens, Chicago, Ill., of counsel), (Kramer, Lowenstein, Nessen, Kamin, & Soll, New York City, of counsel) for plaintiff-appellant.
 Arthur S. Olick, New York City (Anderson Russell Kill & Olick, P. C., New York City, James P. Heffernan, and Tina L. Wellner, New York City, of counsel), for trustee.
 Before LUMBARD, MANSFIELD and MESKILL, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 The sole issue on this appeal from an order of the Southern District of New York affirming a decision of the bankruptcy court is whether the debtor, Bernard Bergman, d/b/a Park Crescent Nursing Home ("Park Crescent"), is the "legal or equitable owner" of real property in the Park Crescent within the meaning of Chapter XII of the Bankruptcy Act, 11 U.S.C. §§ 801 Et seq., which permits a debtor owning such an interest to invoke the jurisdiction of the bankruptcy court for the purpose of arriving at a court-approved arrangement altering or modifying the rights of creditors holding debts secured by the debtor's interest. We hold that the debtor here does have such an interest and therefore affirm.
 
 
 2
 The debtor, Bernard Bergman, formerly operated the Park Crescent, a nursing home located at 150 Riverside Drive in Manhattan. It is one of the largest nursing homes in the state of New York, with a 520-bed capacity and is fully occupied by elderly residents, many of whom are indigent and infirm. The Park Crescent receives more than 90% Of its income from governmental sources through Medicaid and Medicare reimbursements.
 
 
 3
 In 1975 Bergman was indicted by a federal grand jury for filing false tax returns, submitting false Medicaid claims, making fraudulent statements to the federal government, and conspiracy to defraud the government and commit these offenses. He was also indicted by a New York State grand jury for conspiracy, filing fraudulent reimbursement claims, larceny, and obstruction of governmental administration. Negotiations with the United States Attorney for the Southern District of New York and with Assistant Attorney General Charles J. Hynes, the Special State Prosecutor for Health and Social Services, led to a plea agreement, one provision of which was that "Bernard Bergman will pay to the State of New York, voluntarily . . . whatever sums of money are owing to the State of New York from the Towers Nursing Home and other nursing homes in which he has an interest arising out of Medicaid payments."[1]
 
 
 4
 In order to comply with this provision of the plea agreement, Bergman and his wife signed on September 14, 1976, a confession of judgment for.$2.5 million, and a document stating that the Bergmans:
 
 
 5
 " . . . hereby, assign to the O.S.P. (Office of Special Prosecutor) Nursing Home Restitution Fund, and to any nominee (hereafter referred to as the receiver) selected by the Special State Prosecutor, Charles J. Hynes, to act in this matter on behalf of the State of New York and said Fund all right, title, and interest held by us directly or indirectly, in all property, real and personal, wherever situated, this assignment being for the purpose of the liquidation, sale and disposal by the said receiver of said property as is necessary to provide funds to fully satisfy Bernard Bergman's obligation to pay to the O.S.P. Nursing Home Restitution Fund the sum of two million, five hundred thousand dollars."
 
 
 6
 The document further obligated Bergman and his wife to "cooperate with, aid and assist the receiver, in whatever manner he shall request, in the sale, disposition and conversion to cash of our assets," and specified that "(u)pon the payment of such sums ($2,500,000), the receiver shall return to us such of the assets assigned to him as are undisposed of." The Bergman assets thus assigned for the purpose of satisfying the.$2.5 million obligation included Bergman's interests in numerous other nursing home and realty enterprises besides Park Crescent. Simultaneously with the execution of the plea agreement, confession of judgment, assignment and agreement to cooperate, Bergman executed a security agreement which confirms that the sole purpose of the other documents was to assure that the state's judgment would be satisfied.
 
 
 7
 On September 30, 1976, Hynes moved in the New York State Supreme Court pursuant to CPLR § 5528(a) for the appointment of a receiver "to sell . . . property and apply the proceeds therefrom to the satisfaction of the judgment rendered . . . against . . . Bernard Bergman . . . in favor of the judgment creditor, People of the State of New York, for the sum of Two Million Five Hundred Thousand Dollars, plus interest, plus the costs and expenses of the receivership." Ramsey Clark, former United States Attorney General, was appointed receiver of Bergman's assets. People v. Bergman, 55 A.D.2d 542, 389 N.Y.S.2d 589 (1st Dept.).
 
 
 8
 Chase Manhattan Mortgage and Realty Trust ("Chase") is the holder of a mortgage in the principal sum of approximately $7.5 million on the Park Crescent. When the debtor failed to make timely payments on this mortgage in 1976, Chase commenced an action in the Supreme Court of the State of New York to foreclose the mortgage. On October 29, 1976, Chase obtained summary judgment in its favor in the mortgage foreclosure proceeding, and after judgment was entered on May 17, 1977, a foreclosure sale of the property was set for June 10, 1977.
 
 
 9
 However, on June 9, 1977, Bergman filed in the Southern District of New York Bankruptcy Court a petition under Chapter XII, § 422 of the Bankruptcy Act.[2] Thereupon, the bankruptcy court entered an order continuing the debtor in possession and operation of the business and property and staying the foreclosure sale. On June 17, 1977, on motion of New York Attorney General Louis Lefkowitz and Deputy Attorney General Charles J. Hynes, and with the consent of the debtor, the bankruptcy court appointed James L. Garrity as trustee of the debtor's property. Since that time the trustee has been operating the Park Crescent with the approval of the State Department of Health.[3]
 
 
 10
 By motion dated June 14, 1977, Chase sought summary dismissal of the bankruptcy proceeding on the ground that the debtor was neither the legal nor equitable owner of the Park Crescent realty, and was therefore not entitled to invoke the bankruptcy procedures of Chapter XII. The Chase motion was based on Bergman's entry into the September 14, 1976, plea agreement whereby he had assigned all of his assets to the special fund established for the purpose of making restitution to the State of New York for excess payments previously made by the State to Bergman pursuant to allegedly fraudulent reimbursement claims submitted by Bergman's nursing homes. Along with the motion to dismiss, Chase initiated an adversary proceeding seeking an order lifting and/or vacating the automatic stay of the foreclosure sale.
 
 
 11
 After hearings in June and July 1977, Bankruptcy Judge John J. Galgay denied the Chase motion, holding that "the jurisdictional requisites of legal and equitable ownership of realty are present . . . the debtor is recognized in equity as the owner of the property because the real and beneficial use and title belong to him, notwithstanding any 'assignment to the O.S.P. Restitution Fund'."[4]
 
 
 12
 Chase appealed this decision only with respect to the jurisdictional issue to the district court, which concluded that further evidence, including a report from Mr. Clark, the receiver appointed by the state court to sell such of the debtor's property as might be necessary to satisfy the.$2.5 million judgment, should be taken by the bankruptcy court to determine whether Bergman, after satisfaction of the judgment, might be expected to retain any residual interest in the Park Crescent. Judge Pollack noted that this evidence would be relevant to the question of whether the September 14, 1976, Bergman assignment should be treated as a complete divestiture of ownership or as a security instrument, stating,
 
 
 13
 However, if the Bergman assignment is to be viewed only as a security for the Bergman debt to the OSP, there may be basis on which to suggest that Bergman has retained a sufficient equitable interest in the real property on which to ground a Chapter XII proceeding. On the other hand, if the retained interest is factually gossamer and there is no factual chance that Bergman's debt to the OSP will be satisfied out of assets other than the Park Crescent Nursing Home Property, and there is no factual reason for requiring the liquidation of the nursing home under the assignment, there would be some basis for the view that Bergman is not the "legal or equitable owner of real property" within the meaning of Section 406(6) of the Bankruptcy Act.
 
 
 14
 The Appellate Division's order of December 16, 1976 held that "The Bergmans retained a reversionary interest in the assigned assets which would remain unsold after satisfaction of the debt and payment of the ancillary costs." This may mean no more than their expression that a security instrument was given to OSP and unless converted into cash by the Receiver, the property was returnable to Bergman in kind. If there is no chance that this real property is to be sold, then the interest of Bergman may properly be described as equitable.
 
 
 15
 Accordingly, before reaching any conclusion in the premises it appears to the Court that a further evidentiary submission is required on the state of the Clark receivership to the extent that light may be shed on the factual absoluteness of the assignment. This might include the submission of the reports of Mr. Clark as receiver to the appointing court and any other available data to indicate whether there is or is not in fact a real and practical residual interest of Bergman in the real property which will remain intact unsold and be redeliverable to Bergman as soon as it has served its security purpose. In short, does Bergman in fact have any financial interest at stake in the property sufficient to deal with change in the conditions or terms of payment, to change the rate of interest or agree to surrender the title to the property or the profits of same? In re Chalkley, 34 F.Supp. 969, 970 (E.D.Tenn.1940).
 
 
 16
 Appendix Vol. II pp. A-622-624.
 
 
 17
 Upon remand, the bankruptcy court received additional documentary proof and testimony, including that of Mr. Clark, who described his receivership, the process of liquidation, and some of the details of the sales of Bergman's assets that he had thus far arranged. In particular, he testified that he was "very confident" that the.$2.5 million judgment would be satisfied through the liquidation of Bergman's assets, and that he was "95% Certain" that this would be done without sale of the Park Crescent, which he anticipated would eventually be returned to Bergman.
 
 
 18
 Upon this amplified record Judge Pollack affirmed the bankruptcy court's dismissal of Chase's motion, holding that while the precise nature of the debtor's interest and the prospects for a Plan of Arrangement remained in doubt, these doubts should be "resolved in favor of presently sustaining the jurisdiction of the Bankruptcy Court." From this decision Chase appeals.
 
 DISCUSSION
 
 19
 Federal, not state, law determines whether a debtor may invoke the jurisdiction of the bankruptcy court. See, e. g., Segal v. Rochelle, 382 U.S. 375, 379-81, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966); Board of Trade of City of Chicago v. Johnson, 264 U.S. 1, 10, 44 S.Ct. 232, 68 L.Ed. 533 (1924); In re Romano, 426 F.Supp. 1123 (N.D.Ill.1977). On the other hand, state property law may be relevant to determining whether a particular interest qualifies a debtor as the "legal or equitable owner" of real property within the meaning of 11 U.S.C. § 806(6). As one court has stated, state law "supplies the factual matter concerning the nature of (the debtor's) interests; it delineates . . . what rights and obligations an owner of such an interest has." In re Romano, supra, 426 F.Supp. at 1127. Little aid may be gathered from conventional federal or state legal principles in the present case, however, because we are faced with an unconventional arrangement entered into between parties who stand in a unique relationship to each other. Instead of the usual debtor-creditor relationship in which parties adhere more or less to forms and patterns that have been the subject of established judicial construction, we are here dealing with instruments created by parties to a plea bargain in a criminal case, who entered into an arrangement that was unorthodox, if not Sui generis. Absent the use of time-honored forms in a conventional setting, the substance of the arrangement and intent of the parties, both of which are factual matters, become of more importance than they ordinarily would be in determining what interest, if any, Bergman retained in Park Crescent.
 
 
 20
 Chase's first contention here, as it was below, is that the assignment stripped Bergman of any interest, legal or equitable, in Park Crescent. This we must reject. Although the September 14, 1976, assignment on its face purported to transfer to the O.S.P. Nursing Home Restitution Fund "all right, title and interest in all property, real or personal, wherever situated" that was owned by Bergman, he continued as the record owner of Park Crescent. A title search admitted by the bankruptcy court without objection reveals that the last deed of record is in the names of Bernard Bergman and Samuel A. Klurman, a former partner of Bergman who no longer claims any interest in the Park Crescent,[5] having sought to withdraw as a partner, and that no deed transferring any ownership interest from Bergman to the O.S.P., the receiver, or to anyone else, has been executed or recorded. Indeed, although the record reveals the existence of the State's.$2.5 million judgment, it makes no reference to the assignment. As far as the world is concerned, therefore, Bergman remains an owner of Park Crescent. The assignment was ineffective to convey any interest in the realty to the O.S.P. under New York law, which requires "a deed or conveyance in writing, subscribed by the person creating, granting, assigning, surrendering or declaring the same", N.Y. General Obl.Law § 5-703(1). Legal title therefore remained in Bergman, the debtor.
 
 
 21
 Aside from the failure of the parties to comply with the formal procedural requirements of New York law for an effective transfer of Bergman's ownership of Park Crescent to O.S.P., it is clear (1) that the parties did not intend to divest him of ownership unless and until necessary to satisfy the state's judgment against him; (2) that, in view of the wealth of other Bergman assets valued at far more than the amount needed to satisfy that judgment,[6] there was a 95% Chance that such a conveyance would never be required, in which event he would resume both the legal and equitable ownership of Park Crescent after payment of the state's judgment against him, and (3) that the state-appointed receiver of the property treated Bergman as having some form of ownership in the assets, including Park Crescent, subject to the unlikely event that he would be required to execute a deed or other instrument of conveyance transferring ownership to a purchaser in order to satisfy the state's judgment. The receiver has never taken possession of Park Crescent, operated it, or requested a deed or other form of conveyance of it to him or to anyone else.
 
 
 22
 Thus the debtor's control over Park Crescent was restricted to the extent that the receiver might conceivably call upon him for a conveyance of it to others if the receiver decided to sell it in order to satisfy the state's judgment. But in the meantime, and at the time of the debtor's filing of the Chapter XII petition, he remained the record owner of the property and retained a substantial equitable interest in it. In anticipation of our reaching this conclusion, Chase next argues that this interest amounts only to a "possibility of reverter", N.Y.E.P.T. Law § 6-4.5, which has been transformed by the assignment into an interest in personal, not real, property, by application of the doctrine of equitable conversion. We disagree.
 
 
 23
 The doctrine of equitable conversion is essentially an artificial, judicially-created legal device sometimes invoked as a means of permitting realty to be treated as personalty, or vice-versa. Equitable conversion "is not a fixed rule of law but a mere fiction of equity designed to effectuate the Obvious intention of the parties and to promote justice. It rests 'on the presumed Intention of the owner of the property and on the maxim that equity regards as done what ought to be done.' " In Re Maguire's Estate, 21 App.Div. 337, 296 N.Y.S. 528, 529 (2d Dep't. 1937), Aff'd mem. 277 N.Y. 527, 13 N.E.2d 458 (1938) (emphasis supplied). See generally 19 N.Y.Jur.Eq.Conv., §§ 1-26 (1961).
 
 
 24
 Here there is no indication in the assignment or in the behavior of the debtor and the receiver that the parties to the assignment intended the assets to be converted from realty into personalty. Nor does the assignment include an express direction that the particular asset at issue here, the Park Crescent, be sold. Such an express direction is usually a prerequisite to application of the doctrine of equitable conversion. See Chamberlain v. Taylor, 105 N.Y. 185, 11 N.E. 625 (1887). Here, to the contrary, implicit in the assignment and other simultaneously-executed documents, is the understanding that, although the Bergmans agreed to make all of their assets available to satisfy the state's judgment, the receiver would sell only that portion required for this specific purpose and not convert all of the assigned real property willy-nilly into cash. Moreover, in carrying out his duties the receiver has proceeded in just this selective fashion, negotiating for the sale of Bergman assets other than Park Crescent because they would be sufficient to realize the funds needed without major problems whereas the sale of Park Crescent, according to appraisals, should bring more than the amount needed to carry out the parties' intent and would involve major difficulties.
 
 
 25
 Unlike the typical circumstances in which equitable conversion is appropriate, such as one involving a contract for the sale of land or a testamentary disposition, this case does not involve a transaction requiring equitable conversion to achieve the parties' intent. There being no need to apply the doctrine, we reject appellant's contention that the debtor's interest in Park Crescent is an interest in personalty, rather than in realty. We accept and agree with the holding of the New York Appellate Division, when confronted with this question, that Bergman retained a "reversionary interest in the assigned assets which would remain unsold after satisfaction" of the state's restitution judgment, People v. Bergman, supra, 55 A.D.2d 542, 389 N.Y.S.2d 589, 590, See N.Y.E.P.T. Law § 6-4.4. According to New York law, a reversion is fully alienable, descendible and devisable and is a form of ownership that applies "with equal force" to both real and personal property. See Practice Commentary to N.Y.E.P.T. Law § 6-4.4; N.Y.E.P.T. Law § 1-2.15; Guaranty Trust Co. v. New York Trust Co., 297 N.Y. 45, 74 N.E.2d 232 (1947).
 
 
 26
 Finally, appellant contends that even if the debtor has a realty interest in the Park Crescent, it is an insufficient interest to permit proper invocation of the bankruptcy court's jurisdiction. This argument has two parts, the first focusing on the debtor's incidents of ownership, and the second looking to the debtor's capacity to devise a feasible Plan of Arrangement that the bankruptcy court could approve and administer.
 
 
 27
 Only the first of these points relates strictly to the question of the jurisdiction of the bankruptcy court. The second point has not so much to do with the court's jurisdiction as it does with whether the debtor is in a position to achieve the primary purpose of a Chapter XII arrangement an "alteration or modification of the rights of creditors or of any class of them." 11 U.S.C. § 806(1).
 
 
 28
 We need not decide whether the debtor's ownership interest in the Park Crescent realty is a sufficiently sound platform on which to construct a Plan of Arrangement. Certainly the bankruptcy court, which has expertise in these matters, thought there was a sufficient possibility of a successful arrangement to justify the proceedings, and the district court, although expressing greater reservations, affirmed the bankruptcy court's decision. In the absence of evidence indicating that no feasible or acceptable Plan of Arrangement can be devised, we do not propose to overrule them.
 
 
 29
 Our task is to decide whether the bankruptcy court has the Power to proceed, not whether it correctly assessed the debtor's ability to propose a feasible plan. We are satisfied that, in view of the sufficiency of his reversionary interest in Park Crescent for Chapter XII purposes, it would be error to preclude him from invoking the jurisdiction of the bankruptcy court. Certainly his interest is no less substantial than the ownership interests of other debtors whose eligibility under § 406(6) of the Act, 11 U.S.C. § 806(6), has been upheld in the face of similar challenges. See, e. g., Owners of " SW8" Real Estate v. McQuaid, 513 F.2d 558 (9th Cir. 1975) (minuscule interest in 8 acre parcel of real estate, as to which owner had no right of partition or possession, and virtually no right to encumber, lease or improve, was considered sufficient real property ownership). Moreover, although the primary purpose of a Chapter XII Plan is the alteration or modification of the rights of creditors holding debts secured by real property and a debtor may propose a Plan designed to affect only a debt secured by such property, See § 461(7) of the Act, 11 U.S.C. § 861, such as the Chase mortgage with respect to the Park Crescent, a Plan of Arrangement under Chapter XII may also include unsecured debts. Section 461(3) of the Act, 11 U.S.C. § 861(3), states that "an arrangement . . . may provide for treatment of unsecured debts on a parity one with the other, or for the division of such debts into classes and the treatment thereof in different ways or upon different terms". In this case Bergman has already availed himself of this provision, attaching to his Chapter XII petition a schedule of unsecured, as well as secured debts and a schedule of personal, as well as real, property. (Appendix A28-45).
 
 
 30
 Although Chase would prefer, for obvious reasons, to avoid a Chapter XII proceeding and be in a position to foreclose the mortgage held by it on Park Crescent, it still has substantial protection available to it under Chapter XII. The Act authorizes Chase, as a creditor, to propose a Plan of Arrangement under Chapter XII if it does not like the plan proposed by the debtor, Rule 12-36(b); and no proposed plan can be approved unless it is accepted by two-thirds of all creditors within a specified class of secured debtholders, § 468(1) of Act, 11 U.S.C. § 868(1). Moreover, any class of creditors not assenting to the plan must be provided with "adequate protection for the realization . . . of the value of their debts against the property dealt with by the arrangement and affected by such debts," and the four methods for protecting such a non-assenting class of creditors are set forth in § 461(11) of the Act.[7]
 
 
 31
 Prior to confirmation of any Chapter XII plan the court must be satisfied that the plan is both feasible and that it is in the best interests of the creditors, § 472 of Act, 11 U.S.C. § 872. The "best interests" test requires a court to make "a comparison between what creditors would receive under the composition offer and what they would receive in liquidation of the estate. Where the composition offer would pay creditors considerably less than they might reasonably expect to realize in liquidation, the composition was not in the best interests of creditors." 9 Collier on Bankruptcy, 1138 (construing § 872 in light of an identical requirement in former § 12d of the Act).
 
 
 32
 Under the test of feasibility, the court "views the probability of actual performance of the provisions of the plan. Sincerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." 9 Collier on Bankruptcy, at 1139.
 
 
 33
 Finally, if the plan, although confirmed, should fail of execution Bankruptcy Rule 12-41(b) empowers the court to dismiss the case, adjudicate the debtor a bankrupt, or direct that a bankruptcy case proceed, if a number of specific conditions precedent are met. Thus, it is possible that Bergman's inability to execute a confirmed Plan of Arrangement could lead to a straight bankruptcy proceeding or to a dismissal of the case, in either of which events Chase would be in a position to renew its foreclosure efforts.
 
 
 34
 If it becomes apparent that Bergman is not in a position to propose a feasible plan, we are confident that the bankruptcy court will act promptly to protect the rights of all creditors. However, we think that allowing the court to make a reasonable exploration of the possibilities of a plan is a wiser course than barring the debtor from bankruptcy on the ground that his interest in the realty is insufficient to qualify him as a real property owner.
 
 
 35
 Accordingly, we affirm.
 
 LUMBARD, Circuit Judge (dissenting):
 
 36
 I dissent from my brothers' conclusion that Bergman stands as the legal or equitable owner of the Park Crescent Nursing Home and is therefore eligible to invoke the procedures of Chapter XII of the Bankruptcy Act. Bergman's highly unusual position with respect to the Park Crescent property is the result of his indictment in 1975 for fraud in connection with Medicaid and state welfare reimbursements. Following his indictment, Bergman entered into a plea agreement which required, among other things, that he return.$2.5 million to the State. Pursuant to the agreement, Bergman and his wife assigned "all right, title and interest held by us, directly or indirectly, in all property, real and personal" to New York's Office of the Special Prosecutor (OSP), the latter being authorized to sell as much of the Bergmans' property as necessary to satisfy the.$2.5 million obligation.
 
 
 37
 Although the majority is right to state that the only issue before us is whether the bankruptcy court has the Power to proceed, I believe it misconceives the nature of that court's jurisdiction when it suggests that we need not consider Bergman's ability to propose a workable plan. To be eligible for the provisions of Chapter XII a petitioner must qualify as a "debtor," defined in part by § 406(6) of the Bankruptcy Act as "a legal or equitable owner" of real property. This limitation "is correlated with the requirement (of § 406(1)) that a plan have 'for its primary purpose the alteration or modification of the rights of creditors or of any class of them, holding debts secured by real property . . . ' " Collier on Bankruptcy, P 2.07, at 763. Thus, if a petitioner lacks sufficient interest in real property to accomplish a reorganization of the debts secured by such property, he does not qualify as a debtor within the meaning of § 406(6). See In re Chalkley, 34 F.Supp. 969, 970 (E.D.Tenn.1940). Since Bergman by the terms of his assignment to the OSP is without any right, title or interest in the Park Crescent property pending satisfaction of his.$2.5 million debt to the State, he will be without power, absent the consent of the OSP, to surrender title, possession, or income from the property or to otherwise effect the plan of reorganization contemplated by § 406(1). It follows that Bergman cannot be regarded as the legal or equitable owner of the Park Crescent property and that the bankruptcy court lacks subject matter jurisdiction over Bergman's petition.
 
 
 38
 In cases, such as the instant one, where there is substantial doubt concerning a petitioner's status as a debtor under Chapter XII, we should hesitate to rule that the bankruptcy court has jurisdiction. As appellant Chase Manhattan Mortgage and Realty Trust has indicated, the provisions of Chapter XII can be severe for the secured creditor trying to protect himself from losses. In the present case, for example, Chase Manhattan's sizeable investment has been in jeopardy for some time. Further delay will only increase its possible losses. I therefore see no reason why we should strive to interpret Bergman's assignment to the OSP, the absolute nature of which Bergman has affirmed in other proceedings, as leaving him with sufficient interest in the Park Crescent property to invoke the procedures of Chapter XII.
 
 
 39
 I would reverse the order of the district court and direct it to dismiss Bergman's petition.
 
 
 
 [1]
 For a more complete discussion of the criminal proceedings and plea agreement, see our decision in Bergman v. Lefkowitz, 569 F.2d 705 (2d Cir. 1977)
 
 
 [2]
 See 11 U.S.C. §§ 801 Et seq. Chapter XII was enacted principally " . . . to furnish the same relief to individual debtors as is now available to corporations under Section 77B or under Chapter X . . . " H.R.Rep. No. 1409, 75th Cong., 1st sess. (1936)
 
 
 [3]
 The trustee has been successful to a considerable extent in restoring the Park Crescent's economic health. He has secured increases in the reimbursement rate which have led to a 40% Improvement in operating revenues. This has permitted current payment of operating expenses and the creation of a cash reserve for the benefit of creditors. Moreover, the trustee has made current payments of all real estate taxes since he began operating the Park Crescent, and since January 1, 1978, Chase has been paid approximately $64,000 of the $68,000 mortgage payment due it each month, which is the full amount allowed by the State Department of Health for mortgage payments out of nursing home reimbursements
 
 
 [4]
 After the hearing on the motion and the adversary proceeding, the bankruptcy court denied the motion and dismissed the adversary proceeding. Chase appealed the bankruptcy court's decision to the district court only with respect to the jurisdictional issue, and that is all that is now before us
 
 
 [5]
 The district court, in ruling on Chase's motion to dismiss, did not rule on the issue of whether the debtor is properly Bergman or a partnership consisting of Bergman and Klurman with respect to Park Crescent. The debtor has moved in the district court, however, to amend the petition to name the partnership as the petitioner
 
 
 [6]
 The receiver testified that, as result of sales of other Bergman properties, Bergman's indebtedness to the state had been reduced to a little less than $2 million and that he anticipated realizing this amount from the sale of still other Bergman properties, including Riviera Towers, a cooperative apartment building in which Bergman's net interest was valued at $1 million, Danube Nursing Home, worth approximately $1 million, and 6 other nursing homes valued in excess of $1.3 million. The receiver's consultant, James Felt Realty Services, valued the receivership properties other than Park Crescent at between $6.23 million and $7.22 million
 Aside from the foregoing evidence indicating that the other Bergman assets are of more than adequate value to satisfy the state's judgment, there is evidence that the debtor's interest in Park Crescent far exceeds the debtor's liabilities, leaving a substantial equity. Real estate appraisals by experts and an offer to purchase this nursing home indicate its market value, subject to the Department of Health's approval of reimbursement based on the full purchase price, to be between $10.4 million and $14.6 million.
 
 
 [7]
 Section 461(11) of the Act, 11 U.S.C. § 861(11) provides:
 " § 861. Contents of arrangement
 "An arrangement
 "(11) shall provide for any class of creditors which is affected by and does not accept the arrangement by the two-thirds majority in amount required under this chapter, adequate protection for the realization by them of the value of their debts against the property dealt with by the arrangement and affected by such debts, either, as provided in the arrangement or in the order confirming the arrangement, (a) by the transfer or sale, or by the retention by the debtor, of such property subject to such debts; or (b) by a sale of such property free of such debts, at no less than a fair upset price, and the transfer of such debts to the proceeds of such sale; or (c) by appraisal and payment in cash of the value of such debts; or (d) by such method as will, under and consistent with the circumstances of the particular case, equitably and fairly provide such protection; . . . "