**RICHARDSON GREENSHIELDS SECURITIES INC., Plaintiff,**

v.

**Mui–Hin LAU, Ho Sih Fong, Kau–Ying Lau, Ying Lup Lau and Wai Yau Chi, Defendants and Third Party Plaintiffs,**

and

**Ying Tak Lau, Additional Third Party Plaintiff,**

v.

**Lavinia WU, Angelo DaBiero, George T. Hirai and Richard DiGiacomo, Third Party Defendants.**

**Ying Tak LAU, Plaintiff,**

v.

**RICHARDSON GREENSHIELDS SECURITIES INC., Defendant.**

**Nos. 84 Civ. 6134 (CBM), 88 Civ. 2284 (CBM).**

United States District Court, S.D. New York.

April 1, 1993.

Morgan, Lewis & Bockius, New York City by John Linsenmeyer, Thomas R. Stritter, Judith B.M. Greenberg, for plaintiff and third party defendants.

Carey & Ward, New York City by Michael Q. Carey, Augustus C. Venturini, for defendants and third party plaintiffs.

## AMENDED OPINION

### FINDING OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge.

Introduction

This case originated as a breach of contract suit brought by plaintiff Richardson Greenshields Securities, Inc., a commodities brokerage firm, against four of its account holders who had lost large sums of money trading commodities from January 1983 to August 1984, in the process amassing deficit balances of approximately $167,000. Subject matter jurisdiction in this action is based on diversity of citizenship pursuant to 28 U.S.C. § 1332. After lengthy discovery, defendants/third party plaintiffs (hereinafter "defendants" or "the Laus") filed several counterclaims which have become in great measure the focus of this dispute. In short, defendants allege that third party defendant Lavinia Wu, defendants' broker at Richardson, and Richardson, itself, schemed to defraud defendants' and some of Wu's other customers by fraudulently inducing them to: (1) open accounts at Richardson, (2) give de facto discretionary control to Wu, (3) approve trades and keep open their accounts, and (4) erroneously make deposits responding to margin calls. Defendants further allege that Wu stole from her customers, including defendants, and argue that Richardson supervisors aided and abetted the scheme by disregarding industry rules which would have controlled Wu's abuses and by concealing the fraud. Thus, defendants' counterclaims allege violations of the Commodities Exchange Act, common law fraud under New York law, civil violations of RICO, breach of contract, breach of fiduciary duty, conversion, money had and received, and negligence and gross negligence.

After a long pre-trial history before other Judges and Magistrate–Judges of this court, this case was transferred to Judge Motley on March 27, 1992. After a conference on March 30, 1992, it was tried before the court from March 31, 1992 to April 24, 1992. Closing arguments were held on April 29, 1992. By direction of the court, the parties submitted proposed findings of fact and conclusions of law keyed to the record on or about May 15, 1992.

The Background of the Case

I. Parties and Personnel.

Because of the complexity of this case, a directory of the protagonists will prove helpful.

A. The Lau Family.

Defendant Mui–Hin Lau ("MHL") and his wife, defendant Ho Sih Fong ("HSF"), live in Hong Kong. His sister, defendant Kau–Ying

Lau ("KYL"), lives in Canada. These three defendants are sometimes referred to as the "elder Laus."

Mui–Hin Lau and Ho Sih Fong have two sons, defendant Ying Lup Lau, also known as Michael Lau ("ML") and third party plaintiff Ying Tak Lau, also known as Daniel Lau ("DL"). Michael Lau is married to defendant Wai Yau Chi ("WYC").

At the time of the events relevant to this case, Daniel Lau worked at United Orient Bank in New York City. (DL, Tr. 5). The Lau family owned a 25% interest in the bank. (DL, Tr. 6). In January 1983, he became vice-president, director and chief lending officer. (DL, Tr. 6–7). In that capacity he supervised all of the bank's lending activities both personal and commercial. (DL, Tr. 6–7). Previously, Daniel Lau had earned a degree in chemistry from Oregon State University and a Masters in business administration from Portland State University with a concentration in finance. (DL, Tr. 4). He also had been an accountant for a major corporation for three to four years and a management trainee for a national bank. (DL, Tr. 5). Daniel Lau had been convicted in the Southern District of New York of a felony count of conspiracy to defraud an agency of the United States, the Internal Revenue Service, under 18 U.S.C. § 371 (1948). (DL, Tr. 127–29).

At the time of the events in this case, Michael Lau was the supervisor of a building renovation project in lower Manhattan, a part of New York City. (ML, Tr. 2814). He was also a shareholder of United Orient Bank and the manager of his father's real estate interests in New York. (ML, Tr. 136, 146). He became a director of United Orient Bank on December 20, 1983. (ML, Tr. 136).

**B. Richardson Greenshields Securities, Inc.**

Plaintiff, Richardson Greenshields Securities, Inc. is a wholly owned subsidiary of Richardson Greenshields Securities of Canada, the largest commodities brokerage firm in Canada. (Lindh, Tr. 2748, 2756). Richardson, which presently and at all relevant times has been a registered futures commission merchant ("FCM") (*see,* Frazier, Tr. 1345), is a relatively small operation in the United States. (Lindh, Tr. 2755–56).

**C. Lavinia Wu.**

Third Party defendant Lavinia Wu ("Wu") began working at Prudential Bache ("Bache") in December 1979 and shortly became a fully-licensed commodities broker. (Wu, Tr. 681). She was hired by Richardson in December 1982 as an account executive and her broker's licenses were transferred from Bache to Richardson. (Wu, Tr. 699–700). Her titles at Richardson also included salesperson, registered representative, broker and associated person. (Wu, Tr. 681, 698).

**D. Angelo DaBiero.**

Third Party defendant Angelo DaBiero was hired in the fall of 1982 as the branch manager of Richardson's New York retail sales office located at 100 Church Street. (DaBiero 1986 Dep., Ex. JJJ JJJ–1 at 5–6). His responsibilities included insuring that the Account Executives in his office followed all applicable rules, policies and procedures. (DaBiero 1986 Dep., Ex. JJJ JJJ–1 at 27–28). In the fall of 1983, Richardson transferred DaBiero to its Florida office. (DaBiero 1986 Dep., Ex. JJJ JJJ–1 at 9).

**E. Richard DiGiacomo.**

Third Party defendant Richard DiGiacomo was Richardson's vice-president in charge of commodity operations from 1979 to 1985. (DiGiacomo, Tr. 600, 608). DiGiacomo had approximately 26 years of experience in the commodities business. (Tr. 599 DiGiacomo). He was an interim branch manager of the 100 Church Street office during which time he was directly responsible for supervising Wu. (DiGiacomo, Tr. 610).

**F. Alexander McNair.**

Alexander McNair worked for Richardson's parent in Canada from 1952 until 1971 when he moved to the United States and worked for Richardson until September, 1983. When Wu was hired, McNair's titles were senior vice-president, director and secretary. He also acted as a compliance officer

for all branch offices. (McNair Dep., Ex. JJJ JJJ–1 at 6–7, 10, 14–17, 37). McNair's compliance responsibilities included regular visits to the branch offices, daily review of equity runs to check for irregular trading and constant review of account opening documents to ensure those documents were complete, adequate and properly filled out. (McNair Dep., Ex. JJJ JJJ–1 at 37–38).

### G. Kenneth Fuller.

Kenneth Fuller began working for Richardson's Canadian parent on June 1, 1948 and moved to New York in 1971 to work for Richardson. Approximately one year later, he became president of Richardson and held that position until 1983. (Fuller Dep., Ex. JJJ JJJ–1 at 17, 37).

### H. Anthony Ishmael.

Anthony Ishmael has worked for Richardson since 1976 and is currently Richardson's senior vice-president. (Ishmael, Tr. 1185, 1219). In or about October, 1983, Ishmael was transferred from his position of operations manager for Richardson's Chicago office to New York where he became the vice president of administration. (Ishmael, Tr. 1185). In May, 1984, he became the vice-president in charge of commodity operations. (Ishmael, Tr. 1185, 1195). At that time, his duties included overseeing the operations of the commodity exchange floor in New York for Richardson. (Ishmael, Tr. 1195).

### I. William Lewis.

William Lewis moved to New York and worked for Richardson in the middle of 1982 as executive vice-president. (Lewis Dep., Ex. JJJ JJJ–1 at 10–11). He took responsibility for production as the number two officer in Richardson. (Fuller 1991 Dep., Ex. JJJ JJJ–1 at 102–03). Lewis was the supervisor of both DaBiero, Richardson's branch manager, and Hirai, during their respective tenures as the managers of the 100 Church Street office. (DaBiero 1986 Dep., Ex. JJJ JJJ–1 at 28; Hirai 1988 Dep., Ex. JJJ JJJ–1 at 17). Fuller testified that Lewis would be the person most knowledgeable about the hiring of Wu along with DaBiero and DiGiacomo. (Fuller Dep., Ex. JJJ JJJ–2 at 194–

96, 198). Lindh, Richardson's compliance officer, testified that Lewis had taken over the duties of president by the time the Laus' accounts were liquidated in July, 1984. (Lindh, Tr. 2966, 2977). As of December, 1991, Lewis worked for Richardson's parent in Canada.

### J. George T. Hirai.

Third Party defendant George T. Hirai was branch manager of the 100 Church Street office from March 1984 until March 1985. (Hirai 1988 Dep., Ex. JJJ JJJ–1 at 4, 6). His responsibilities included overseeing Wu's sales activity and compliance. Hirai and his superior, Lewis, reviewed, among other things, new customer account forms. (Hirai 1988 Dep., Ex. JJJ JJJ–1 at 16–17).

### K. Henry C.V. Lindh.

Henry C.V. Lindh worked for Richardson from 1980 to 1985 and was hired by Fuller. (Lindh, Tr. 2735, 2744). Prior to joining Richardson, Lindh had no experience of any nature relating to commodities. (Lindh, Tr. 2741, 2743). Six to eight months after he joined Richardson, Lindh became Richardson's chief financial officer and a senior vice-president. (Lindh, Tr. 2745). In 1983, Lindh became the compliance officer working at first with McNair. (Lindh, Tr. 2745–46). Previously, Lindh had no experience in compliance. (Lindh, Tr. 2748–53). Fuller was aware of Lindh's lack of experience in commodities compliance. (Lindh, Tr. 2776).

### L. Robert DiSarro.

Robert DiSarro has been the sole floor manager for Richardson on the New York exchange floor since November 1982 and is currently a vice-president. (DiSarro, Tr. 2547–48). He has been a member of the Commodities Exchange, Inc. ("COMEX") and the Coffee, Sugar and Cocoa Exchanges since the summer of 1983 and is also a member of the New York Mercantile and Cotton and Orange Juice Exchanges. (DiSarro, Tr. 2548–49). He holds these memberships through Richardson. (DiSarro, Tr. 2549). In 1983–84, he was responsible for supervising all of the clerks employed by Richardson on the exchange floor, except the clerks

working at Richardson's platinum booths. (DiSarro, Tr. 2551, 2553).

### M. Commodity Exchange Center.

The Commodity Exchange Center ("CEC") acted as an agent for the COMEX and the other exchanges on the New York commodities exchange floor, providing security services, among other things. (Burke, Tr. 325). The CEC provided exchange members and their employees with badges and identification cards to ensure that only people with proper identification had access to the exchange floor. (Burke, Tr. 325). Telephone clerks in 1983–84 were registered with and by COMEX through the CEC. (DiSarro, Tr. 2559; Frazier, Tr. 1465).

### N. Louis Burke.

Louis Burke was Richardson's expert witness at trial. He has a close working familiarity with COMEX operating rules and floor procedures, having served as house counsel for the COMEX and having been present on the COMEX floor well over a thousand times. (Burke, Tr. 229, 231–32, 309–10).

### O. Linda Frazier.

Linda Frazier was defendants' expert witness at trial.

### P. Some of Wu's other customers who testified at trial for the Laus:

1. Herbert Zschiegner had studied economics. He also ran a precious metals refining business, specializing in precious gold, silver and platinum. (Zschiegner, Tr. 1509–10).

2. Brendan Patrick O'Sullivan had two undergraduate degrees, in mathematics and accounting, and worked as a business consultant for Ernst & Whinney. He opened a commodities trading account with Wu at Bache in 1981 or 1982. (O'Sullivan, Tr. 1389–90, 1426–27).

3. Show Jang Mou worked in a restaurant's kitchen, had attended classes in small business management and owned a small apartment building. Prior to trading at Richardson, he had no previous experience in commodities futures trading. (Mou, Tr. 1933–35, 1939–40, 1953).

4. Chien Pin Li worked in his father's restaurant. He spoke little English and his reading and writing of it was poor. He opened his commodities account in his name but with his family's backing. Prior to trading at Richardson, he had no previous experience in commodities futures trading. (Li, Tr. 1780–82).

## II. The Events at Bache.

### A. Account Openings.

The story of this case begins in 1981 when the Lau family initiated contact with Wu while she was employed as a broker at Bache. (Wu, Tr. 682; ML, Tr. 137–38). Mui–Hin Lau was interested in buying precious metals. (ML, Tr. 138).

Four accounts were opened for the Lau family at Bache in 1981. Three were in the names of the elder Laus and the fourth was a joint account in the names of Michael Lau and his wife, Wai Yau Chi. (DL, Tr. 10). Mui–Hin Lau's money was used to open the joint account. (ML, Tr. 2819–20).

When the accounts were opened, Wu explained the risks of commodity trading to each of her customers. (Wu, Tr. 687–88). Michael Lau testified that Wu told him and his father that they would be at risk of losing a lot of money in commodities trading. (ML, Tr. 147, 2818).

### B. Trading at Bache.

Mui–Hin Lau initiated the first few trades at Bache. (ML, Tr. 147). After that, trading decisions were made in discussions between Michael Lau and Wu. (ML, Tr. 148). From that point on, Michael Lau rarely contacted his father or aunt about trades and never sent trade confirmations to the elder Laus; indeed, he testified that he never told his father or aunt of the trades he authorized in their accounts. (ML, Tr. 148, 152–53).

Michael Lau sat with Wu at her desk at Bache all day every day for approximately fifteen months, learning about commodities trading. (ML, Tr. 149–50). During that time, Michael Lau listened to the Bache loud-

speaker announcements, watched price changes on a monitor and discussed commodities with Wu, among other things. (ML, Tr. 150–51, 2822–23, 2840–41; Wu, Tr. 692). He spent at least half the time talking with Wu and following price changes on the monitor. (ML, Tr. 2837). Frequently, he and Wu discussed trading in the Lau Accounts. (ML, Tr. 2822–23; DL, Tr. 12). In those discussions, Michael Lau made an effort to learn how world events influenced market prices for commodities. (ML, Tr. 2842–43).

When Michael Lau was away, Wu called suggestions in to Daniel Lau about all four accounts and he concurred in trade recommendations. (DL, Tr. 13, 17, 2636–37). For instance, when Michael Lau was in Hong Kong from December 1981 to March 1982, Daniel Lau discussed with Wu trading the four Bache accounts. (ML, Tr. 2859–60; DL, Tr. 13). Michael Lau had no complaint about that. (ML, Tr. 2860–61). Daniel Lau agreed with most of Wu's recommendations. (DL, Tr. 17–18).

From time to time, margin calls were made on one or more of the Lau accounts. (ML, Tr. 159). In such instances, Michael Lau paid the margin payments out of his bank account. (ML, Tr. 159–60). Michael Lau claims he does not know where the money came from to back those checks. (ML, Tr. 159–61).

III. The Move to Richardson.

A. Richardson hires Wu.

In December 1982, Richardson hired Wu as an account executive. (Wu, Tr. 920). It appears that one reason Richardson hired Wu was her client base. During DaBiero's interview of Wu, DaBiero asked Wu about her customers at Bache. (DaBiero 1986, Ex. JJJ JJJ–2 at 82). Wu represented that she believed she would be able to bring clients to Richardson. (DaBiero 1986, Ex. JJJ JJJ–2 at 82). Wu had shown Richardson an equity list from Bache and stated that she believed most of her customers would come with her to Richardson. (DiGiacomo, Tr. 630). In fact, Wu brought twelve accounts to Richardson. (Ex. KKKK–1 to –8, 33b, 33c, 33d, 33e). Wu, initially, was DiGiacomo's most profit-able account executive. (DiGiacomo, Tr. 672).

At that time, Richardson was expanding its New York branch office for commodities trading. (McNair Dep., Ex. JJJ JJJ–3 at 133). Richardson first opened a retail office in New York in the early 1980's (Ishmael, Tr. 1219; Lindh, Tr. 2761, 2735). Lewis frequently discussed the opening and expansion of the 100 Church Street office with Fuller for a period of time in 1982. (Fuller 1991 Dep., Ex. JJJ JJJ–1 at 104–05). During DaBiero's tenure as manager of the 100 Church Street office, the number of account executives employed by Richardson grew from approximately eight to approximately twenty-two. (DaBiero 1986 Dep., Ex. JJJ JJJ–3 at 65). At the time the New York office was closed in November of 1984, only six account executives were employed. (Lindh, Tr. 2762; Ex. ZZZ).

B. Accounts openings at Richardson.

After the Lau brothers decided to move the Lau family accounts from Bache to Richardson, Wu assisted the Lau brothers in withdrawing the money and securities in the Bache accounts for the purpose of depositing them in new accounts at Richardson. (Ex. GG, GG–1, GG–2, GG–3; DL, Tr. 2638–39; ML, Tr. 2862).

Mui–Hin Lau, Ho Sih Fong and Kau–Ying Lau deny that they signed any documents to open an account at Richardson. (MHL, Tr. 1628–29; HSF, Tr. 1648; KYL, Tr. 1652; See Ex. 33c, 33b, 33e). They testified that they first learned that accounts were opened in their names at Richardson at a meeting on August 9, 1984 when Richardson employees informed them that they owed Richardson money. (MHL, Tr. 1629; HSF, Tr. 1649; KYL, Tr. 1652). The elder Laus immediately denied any liability to Richardson. (MHL, Tr. 1629–30; Lindh, Tr. 2969–70, 2974).

Ho Sih Fong testified that she did not give Daniel Lau the authority to place her name on account opening documents at Richardson (HSF, Tr. 1649–50); Mui–Hin Lau and Kau Ying Lau also testified that they did not give Michael Lau the authority to place their names on account opening documents at Richardson (MHL, Tr. 1629, 1631; KYL, Tr.

1652–1653). Wai Yau Chi never signed any documents to open an account at Richardson and no such documents were ever signed in her name. (ML, Tr. 2856; Ex. 33d).[1]

Defendants ask the court to find that Wu knew that Michael Lau and Daniel Lau forged the names of the elder Laus on the account opening documents at Richardson. Defendants argue that Wu should have inferred the forgery based on the dates the forms were delivered and completed, the "practice" of the elder Laus to visit New York every summer—not winter, when the forms were completed—and their "practice" to visit Wu on such visits. However, the evidence for such and other inferences is lacking in the record and contradicted by Daniel Lau who testified that he hid the forgery from Wu. (DL, Tr. 2725–26). Thus, although defendants ask the court to find that Wu never contacted Mui–Hin Lau, Ho Sih Fong, Kau Ying Lau or Wai Yau Chi to confirm that they wished to close their accounts at Bache or to open new accounts at Richardson, which is true (MHL, Tr. 1641–42; HSF, Tr. 1650–51; KYL, Tr. 1653), the court finds that Wu could assume that the elder Laus agreed to the switch based on the signed account opening documents at Richardson.

In the period running from December of 1982 to the summer of 1984, Wu executed many trades in the various Lau accounts. The losses amounted to approximately $2,000,000, money which Daniel Lau had taken from his uncle's account at the bank, apparently without the uncle's permission. The uncle is not a party to this action.

## IV. *Plaintiff's Case*

The threshold legal question with respect to Richardson's case is whether the controverted trades were authorized by defendants. If they were unauthorized, another legal question arises under the factual scenarios presented at trial: Were they ratified by the Laus so that they should be held liable for the account deficits?

## The Legal Analysis

### I. Were the trades authorized?

#### A. Actual authority

■ The facts adduced at trial seem to indicate that there was actual authority to trade only the Michael Lau account. Thus, at the very least, Michael Lau had authority to trade in his own account, and is liable to Richardson for the amounts owed therein. Daniel Lau did not have any accounts in his name. For the other accounts, it is far more doubtful that actual authority existed.

Prior proceedings in this matter have assumed that the trades in question were authorized. "Whether the Laus individually signed each customer agreement or whether Michael and Daniel Lau signed them pursuant to Powers of Attorney or on a theory of apparent or implied authority, Richardson has demonstrated that the accounts were traded by Michael Lau with Mui–Hin Lau's knowledge and apparent consent." *Richardson Greenshields Securities v. Mui–Hin Lau,* 651 F.Supp. 929, 932 (S.D.N.Y.1986). However, the mere fact that Judge Wood, six years ago, found, preliminarily, that there was actual or apparent authority to make the trades in question can have little force in this proceeding. Thus, this court must review the facts in question given the testimony and evidence presented at trial to determine for itself whether actual authority existed.

#### *The Powers of Attorney:*

One of the more contentious issues debated in this controversy is the legitimacy of several powers of attorney on file with Richardson. Richardson contends that they were validly executed (See, e.g. Plaintiff's Proposed Findings of Fact, at 5); not surprisingly, the Laus contend that they were not. Oddly enough, one reason the Laus cite for the invalidity of the powers of attorney is that Michael and Daniel Lau forged them.

The record indicates quite clearly that actual authority legitimately existed in the predecessor accounts at Bache. Powers of attorney were executed by Mui–Hin, Ho Sih Fong, and Kau–Ying Lau in regard to their

---

**1.** Indeed, counsel for Richardson confirmed during trial that the complaint against Wai Yau Chi was going to be dismissed on motion of Richardson. (Tr. 1305–06).

**1256**

accounts at Bache. (Ex. V–2; Pl.Ex. 33b, 33e).

On the other hand, there is some doubt as to whether actual authority for Wu to trade at Richardson existed via the valid execution of powers of attorney in several of the Lau accounts. At their inception, for example, there were no powers of attorney submitted for three of the four Lau accounts at Richardson until four to five months after the opening of the accounts. (Ex. 33b, 33c, 33e; ML, Tr. 2871, 2873). Richardson was not able to produce a power of attorney for the account of Ho–Sih–Fong, except for one dated May 1983. Receipts given to Michael and Daniel Lau include complete copies of the opening documents for each account, signed by either but do not include copies of the powers of attorney for those accounts. (Ex. GG, GG–1, GG–2, GG–3).

Testimony indicated that it was Richardson's procedure to halt trading where a power of attorney was missing in an account where discretion to trade in that account was vested in a third-person. (Ex. JJJ JJJ–6 Dabiero 86 p. 140; 91 p. 106–07). Richardson says it found powers of attorney missing in the Lau accounts but did not halt trading in accounts of Mui–Hin, Ho Sih Fong, or Kau–Ying Lau. (Ex. Z, AA, BB).

Defendants also believe that, knowing Daniel Lau had a power of attorney over the account of Ho Sih Fong, Wu opened the account without using the home or the business address of Daniel. This power of attorney with Daniel Lau's address is dated May 2, 1983, while the account opening documents are dated December 30, 1982. (See Pl. Ex. 33b).

*The Knowledge of the Accounts by the Various Laus*

The elder Laus testified that they were oblivious to the activity in their accounts. Mui–Hin Lau, Ho Sih Fong, Kau Ying, and Wai Yau Chi claimed that they did not sign the account opening documents for their accounts. (MHL, Tr. 1628–29; HSF, Tr. 1648; KYL, Tr. 1652; Pl 33b, 33c, 33d, 33e).

Wu allegedly "knew" that account opening documents for Mui–Hin Lau, Hoh Sih Fong, and Kau–Ying Lau had to be signed by ei-ther Daniel or Michael Lau, because Wu "knew" that Mui–Hin Lau and Hoh Sih Fong visited the United States in the summer of each year, not in December when the accounts were opened. (MHL, Tr. 1629–30).

Additionally, defendants argued that Richardson did not supervise Wu when she oversaw the Laus' account opening documents as required by the applicable commodity trading regulations. (Frazier, Tr. 1479–80). Thus, "knowing" that Mui–Hin Lau and Ho Sih Fong lived in Hong Kong, and Kau Ying in Canada, Wu opened the New York accounts for them at Richardson using a New York address. (Wu, Tr. 686; Pl. Ex 33b, 33c, 33e). However, while a New York address was designated as the mailing address, the foreign addresses were also included in the account opening documents.

Defendants further claim:

At the time that Daniel Lau opened the account at Richardson in the name of Hoh Sih Fong, he completed customer application forms identifying Wu as the person who would control the account, believing at that time that Wu would formally exercise such control. (DL, Tr. 2647).

Defendants also claim that Richardson, Wu, and Richardson's staff were aware that the existence of the accounts at Richardson in the names of Mui–Hin, Kau Ying, and Ho Sih Fong were not known to Mui–Hin Lau, Kau Ying, or Hoh Sih Fong, and that in the joint account in the names of Michael Lau and Wai Yau Chi, Wai Yau Chi did not control any trading or make any decisions.

Richardson, it is claimed, failed to prove losses were ever presented in writing to Michael Lau and Wai Yau Chi jointly or to Mui–Hin Lau, Ho Sih Fong, or Kau–Ying Lau as a bill for payment. The monthly statements were not accounts stated. (Ex. TT, UU, VV, WW).

Richardson allegedly purposefully avoided communication to Mui–Hin, Ho Sih, or Kau–Ying at their residence. Richardson never sent, contrary to their usual practice, a letter to these customers whose accounts had discretionary control vested in a third person. (Ishmael, Tr. 1269). Mui–Hin, Ho Sih Fong, and Kau–Ying never received any communi-

cation from Richardson prior to the attempt to collect from them in August of 1984. (MHL, Tr. 1641–42; HSF, Tr. 1650–51; KYL, Tr. 1653).

When Fong and Mui–Hin met with Richardson employees on Aug 9, 1984 to discuss the deficits outstanding in the accounts in their name at Richardson, each denied ever opening an account at Richardson or having any liability to Richardson. (MHL, Tr. 1630; Lindh, Tr. 2969–70, 2974).

Thus, according to the defendants' contentions, actual authority was lacking. The court finds that it is clear that the only account where it is incontrovertible that actual authority existed is that of Michael Lau. His argument that since his wife was unaware of the trading he is not liable for the deficits is unpersuasive. He cannot evade liability for his own actions by claiming that he hid them from his wife. Thus he is held liable for the deficits in his account. The evidence regarding the other accounts is not so clear.

However, the court holds that, again according to defendants' own characterizations of the relevant facts, that there was either apparent authority or ratification of the trading by the defendants. Thus, regardless of whether actual authority existed, the other Laus are still liable for the account deficits on other legal grounds.

### B. Apparent Authority

■■■ Under the doctrine of apparent authority, a customer can be held liable for trading in his or her account even when actual authority to trade is lacking. *Herbert Construction Co. v. Continental Ins. Co.*, 931 F.2d 989, 993–94 (2d Cir.1991); Restatement (Second) Agency, § 8 (1958). When a finding has been made that a third person who trades in the account has apparent authority to do so on behalf of the named account holder, this finding of apparent authority can then be used against the account holder to render him liable for the trades made in his account and for the account deficits incurred therein. *Citibank, N.A. v. Nyland (CF8), Ltd.*, 878 F.2d 620, 624 (2d Cir.1989); Restatement (Second) Agency, § 159 (1958) ("principal is subject to liability upon con-

tracts made by an agent acting within his apparent authority").

■■■ The burden of proving justifiable reliance on the apparent authority is on the broker, Richardson, and is a burden of factual production. The finding of apparent authority is a factual exercise by the district court that is properly made when the principal acts in a manner that gives the impression that the agent has authority to act on his behalf. *Herbert Construction Co. v. Continental Insurance Co.*, 931 F.2d 989, 993–94 (2d Cir.1991). "The law in New York is quite clear that one who wishes to rely on an agent's apparent authority must be able to point to particular instances of "misleading conduct" by the principal which gives a false impression that the putative agent had authority to act for him." *E.F. Hutton v. First Florida Sec.*, 654 F.Supp. 1132, 1143 (S.D.N.Y.1987). Here, a finding of apparent authority is supported by the facts of this case.

### The Predecessor Accounts at Bache

At Bache, in the predecessor accounts, Michael had power of attorney to authorize trades in his father's and aunt's accounts. Daniel had power of attorney to authorize trades in his mother's account. (Defendants' Contention of Fact 4, JPTO).

At the time that the Bache accounts were opened, the three elder Laus executed trading authorizations in favor of the Lau brothers. (ML, Tr. 139–46). Specifically, Mui–Hin Lau and Kau–Ying Lau both signed a power of attorney giving Michael Lau trading authority over their accounts. (ML, Tr. 139–45, 2820–21). Ho Sih Fong signed a power of attorney in favor of Daniel Lau. (DL, Tr. 11, 2630).

At Bache, a pattern of trading developed: Wu and Michael Lau would talk over a recommendation by Wu and Michael Lau would approve the trade before the trade was executed. (ML, Tr. 155, 2827). The discussion would be about all four Lau accounts and Michael Lau would approve trades in all four Lau accounts. (ML, Tr. 2833; DL, Tr. 19). Michael Lau would always receive confirmations of trades which were made. (ML, Tr.

155; Ex. 3, 4, 5, 6). Michael Lau agreed with Wu's trading recommendations in the great majority of instances, although he understood that at any time he could have rejected those recommendations. (ML, Tr. 151).

The Lau brothers treated the four accounts as a single combined family account. (DL, Tr. 101; Wu, Tr. 876–77). Generally, Michael Lau made the trading decisions on all four accounts while sitting alongside Wu. (DL, Tr. 101, 2632–33). Daniel Lau thought it was fine for trading decisions to be made by Michael Lau and Wu for his mother's account. (DL, Tr. 2633).

At the request of the Lau family, all the Bache account statements were sent to Michael Lau's home address on East Broadway in New York City. (DL, Tr. 10–11; Wu, Tr. 694, 888). Michael Lau regularly received those monthly statements and never protested any of those statements. (ML, Tr. 155–57; Ex. 11, 12, 13). Daniel Lau also regularly reviewed his mother's Bache trading statements, annotating them as to profits and losses. (DL, Tr. 13, 17). He never protested any of the trades. (DL, Tr. 17).

When margin payments were refunded or when the Laus received checks from profitable trades, Michael Lau or Daniel Lau endorsed the names of the elder Laus on the Bache checks payable to the elder Laus. (ML, Tr. 157–58). Michael Lau testified that when he endorsed his father's signature on his father's checks from Bache he did not think he was doing anything wrong. (ML, Tr. 157–58).

*The Richardson Accounts*

On December 30, 1982, Wu's first day of work at Richardson, Michael and Daniel Lau and several other customers of Wu opened accounts at Richardson. The Lau brothers wanted the Richardson accounts set up the same way as the Bache accounts had been structured. (DL, Tr. 2651, 2653). They intended to set up four accounts, three in the names of the elder Laus and one joint account for Michael Lau and his wife. (ML, Tr. 179–80). Without Wu's or Richardson's knowledge, however, the Lau brothers forged the names of the elder Laus on the new account forms and on the Bache checks

deposited in the newly created Richardson accounts. (DL, Tr. 38–40; ML, Tr. 168–70, 176–77).

Daniel Lau signed his mother's name to the Richardson customer application, arbitration agreement and risk disclosure statement. (DL, Tr. 38–40; Ex. 33b). He did not tell Wu that he was closing his mother's Bache account and opening the Richardson account without his mother's permission nor that he endorsed his mother's name without permission on the Bache check used to open the Richardson account. (DL, Tr. 2725–26, 2733). He assumed his mother would approve the move of her account from Bache to Richardson. (DL, Tr. 54).

Daniel Lau entered Wu's name on his mother's new account form as the person to trade the account. (DL, Tr. 2647). Wu told him that that was wrong and Daniel Lau corrected himself, writing his own name on the form. (DL, Tr. 2647). Otherwise, Wu did not explain the forms since he had been trading commodities with her for two years. (DL, Tr. 2651–52).

Similarly, Michael Lau completed new account forms at Richardson for his joint account with his wife, his father's account and his aunt's account. (ML, Tr. 168–70, 174, 176–77; Ex. 33c, 33d, 33e).

Daniel Lau and Michael Lau endorsed the names of the elder Laus on checks issued by Bache when the Bache accounts were closed and deposited those funds at Richardson. They did not think they were doing anything wrong by doing this. (ML, Tr. 157–58, 2865; DL, Tr. 2653–54).

Daniel and Michael Lau thus admitted to specific instances of misconduct which gave Richardson the impression that they had authority to trade in all of the Lau family accounts. Thus, they cannot complain if their acts give rise to a finding that they had the authority to trade in all the Lau accounts. Under the doctrine of apparent authority the Lau brothers can be held liable for the account deficits.

Additionally, Daniel Lau testified that while the Lau accounts were being traded at Richardson, in 1983 and 1984, the Lau family

as an entirety was aware of the fact that such trading was going on. They knew that Wu was the broker on those accounts and that Michael and Daniel Lau were authorizing trades on their behalf. (DL, Tr. 123–24). The Laus now claim that it was "understood" somehow that this authority was limited to the authority to trade the family commodity accounts with Wu at Bache but not the family commodity accounts with Wu at Richardson. What Daniel Lau said they did not know was that, in his words, "we are losing so much money." (Id.). They were in full knowledge, however, that Michael and Daniel were trading commodities with Wu as their account broker. They learned of this trading activity when they visited Wu on the CO-MEX floor while their accounts were being traded at Richardson. (ML, Tr. 180–81).

The actions of the older Laus in leaving to Michael and Daniel Lau complete authority and discretion to trade the family accounts, with respect to which they never sought to intervene while the accounts were at Richardson, is legally sufficient to cloak Michael and Daniel Lau with the apparent authority to trade them.

The court finds and concludes that Daniel and Michael Lau had apparent authority to trade the Lau family accounts, an authority that renders the Lau family liable for the account deficits.

## II. The Ratification of the Trades by the Laus

■ Even if actual or apparent authority is absent, defendants may still be held liable for the margin deficits in question. The court holds that, while the younger Laus had apparent authority to trade in all of the Lau family accounts, even if this apparent authority was lacking, the trades in question were ratified by defendants so that defendants owned the trades and therefore must pay the deficits incurred in the accounts.

■ The doctrine of ratification prohibits the customer from disavowing unauthorized trading in his or her account when "it is clear from all circumstances that the *intent* of the customer was to adopt as his own and for all times the trades executed for his account

without authorization." *Blome v. R.G. Dickinson*, Comm.Fut.L.Rep. (CCH) ¶ 21,916 ['82–'84 Transfer Binder] (November 13, 1983) (emphasis added).

According to defendants, Michael and Daniel Lau wanted to achieve independence from their father by demonstrating their business acumen through getting rich in the commodities markets. Michael felt that commodities trading was to be his way of proving himself to his father, Mui–Hin Lau. The transfer of the accounts from Bache to Richardson was seen as a means of achieving this end. (See Defendants' Contention of Fact 6, JPTO).

The burden of proving ratification is, again, on the broker. *Studley Inc. v. Gulf Oil Corp.*, 282 F.Supp. 748, 752 (S.D.N.Y. 1968), rev'd on other grounds 407 F.2d 521 (2d Cir.1969). See also *Herman v. T. & S. Commodities, Inc.*, 592 F.Supp. 1406, 1418 (S.D.N.Y.1984); *Bishop v. Siegel Trading Co.*, Comm.Fut.L.Rep. (CCH) ¶ 20,566 ['77–'80 Transfer Binder] (March 7, 1978). Richardson has met this burden.

■ Ratification occurs when the customer acquiesces in the unauthorized trading. A finding of acquiescence will issue if the customer knew the pertinent facts surrounding the transactions in question. "Knowledge of the pertinent facts and the clear intent to approve the unauthorized action is a precondition to ratification. A failure to object over a long period of time is evidence of acquiescence in the unauthorized activity." *Modern Settings v. Prudential–Bache Securities*, 709 F.Supp. 70, 76 (S.D.N.Y.1989), aff'd in part and rev'd in part, 936 F.2d 640 (2d Cir.1991).

■ However, while the burden is on the broker to show ratification, the customer is also under an obligation to show, if the broker can show that the customer was aware of the controverted trades, that this knowledge did not rise to the level of ratification. A customer with knowledge of unauthorized trading is under a duty to speak and inform the broker in a timely manner that he or she wishes to repudiate those unauthorized trades. "Should a customer, who has been informed that he must make a timely complaint of unauthorized trades, fail to noti-

fy or to attempt to notify the futures commission merchant of unauthorized transactions, the customer will have breached his duty to the futures commission merchant and thus must absorb himself any aggravated losses resulting from the subsequent liquidation of the unauthorized trading positions." *Sherwood v. Madda Trading Co.*, Comm. Fut.L.Rep. (CCH) ¶ 20,728 ['77–'80 Transfer Binder] (January 5, 1979). The merchant must be given the chance to rectify any problems with disputed trading. Otherwise, customers can take advantage of mistakes by associated persons and use "unauthorized or mistaken trades as a means to play the market with impunity, only repudiating the trades in question if they finally become losing propositions." *Id.* The customer must take action to disavow the trades in question and, absent complaint, the trades will be ratified by the customer's failure to object. *Modern Settings v. Prudential Bache Securities*, 936 F.2d 640, 645 (2d Cir.1991).

Both Daniel and Michael Lau purposefully opened the accounts with the goal of making money and escaping the influence of their father over their destiny. They admit to forging the signatures of the other Laus; indeed, they claim that such forgery somehow exculpates them. They knew of all activities at all times, even though the other Laus might not have known.

At the time that the Lau accounts were opened at Richardson, the Laus claim that Wu told Michael Lau that if it was discovered that the accounts were opened as they were, by other than the account holder and without powers of attorney, Richardson would be in trouble. Wu asked for Powers of Attorney only after losses in the Lau accounts exceeded hundreds of thousands of dollars. (Ex. NNNNN). The Laus assert that Richardson did so to protect itself, for if the Laus were unable to meet margin calls in the future and their accounts were liquidated, Richardson would sue for the deficit, as it did in this case, and it wanted some record with which to defend itself.

The elder Laus had vested in Michael and Daniel Lau the authority to trade commodities for them. By not protesting or investigating the activities in their accounts the elder Laus ratified the trades made in their name and ostensibly on their behalf.

*The Laus had sufficient knowledge to ratify the trading done in the Lau accounts.*

■ Michael Lau, indeed, none of the Laus, were experienced platinum traders. (ML, Tr. 150–1). Neither were they Ph.D.'s in economics. However, a commodity customer need not be an expert or a financial genius in order to trade on the commodities markets; if so, then the markets would be virtually devoid of customers and brokerage firms would have few if any customers. What is important, however, is the customer's understanding and knowledge of the trades in question. *Herman v. T & S Commodities*, 592 F.Supp. 1406, 1417–18 (S.D.N.Y.1984).

Here, both Wu and Richardson had the right to assume that the Laus knew what they were doing. They knew the risks involved in trading, the possible benefits to be gained, and the possible losses that could be sustained. Michael Lau's constant presence at Wu's side for months on end, and his and Daniel Lau's constant contact with Wu at all relevant times that commodities were being traded on their behalf, provided an ample opportunity for them to educate themselves about the business of trading commodities. This, and their unwavering promptness in paying all margin calls on the Lau accounts, justified Richardson's reliance on their suitability to trade as commodities customers.

This is not a case where the customers had *no contact* with the broker and then are shocked to discover the trading in their account. On the contrary, this case is almost unique in the extensiveness of the contacts between the broker and the customers. The Richardson accounts were actively traded in 1983 and 1984. Between January and March of 1983, Michael Lau had daily contact with Wu, driving her to work every day. In the car ride to work Michael Lau and Wu discussed the market and trading in the Lau accounts. (Defendant and Third–Party Plaintiffs Proposed Finding of Fact 23 in the Joint Pretrial Order; ML, Tr. 183–84, 2889). Testimony indicated that while at Richardson the contact between Michael Lau and Wu was less than that at Bache because Michael

could not sit next to Wu on the floor of the COMEX. At Bache, Michael Lau sat next to Wu at her desk. However, Wu was in constant contact with either Michael of Daniel Lau about trading in their accounts at Richardson. (ML, Tr. 183).

This court finds the Laus' protestations of total ignorance about their commodity trading rather bizarre in light of the fact that Michael Lau spent over an entire year with Wu at Bache observing the workings of the commodities markets and consulting with her about trades. (Defendant and Third–Party Plaintiff's Proposed Finding of Fact 36 in the Joint Pretrial Order; ML, Tr. 149–51). This observation was purposeful and accompanied by numerous questions of Wu by Michael Lau about the various trades. Michael wanted to learn how to trade and was given the opportunity by Wu. (ML, Tr. 2837–43).

Daniel Lau also understood how trades were made, understood appreciation and depreciation, and understood the role of margin deposits and open positions, and understood how profits (and losses) could be generated. (DL, Tr. 2728–31).

Daniel Lau has admitted that the Laus received timely and full information about the trades in their Richardson accounts and that any time there was trading activity either Michael or Daniel Lau spoke to Wu. (DL, Tr. 134).

*The Laus regularly paid all of the margin calls on their accounts. This was undisputed. Not once did they protest.*

Including the initial deposits and margin calls, Michael and Daniel Lau made net deposits at Richardson in amounts of $1,970,471.04, none of which was ever returned. (Frazier, Tr. 1734–35; ex. NNNNN). The Lau brothers also paid commissions in the amount of $53,000 and fees of $2,933.52. The difference between the total loss of $2,146,953.02 and the net deposits is the deficit balance Richardson claims it is owed, approximately $167,482.00 (the actual claim is for $167,212.00)

*The Laus contend that Wu made unauthorized trades and that Richardson did not investigate this and let her do so.*

Wu, it is alleged, controlled trades in the accounts of Michael Lau, Mui–Hin Lau, and Kau–Ying Lau without consulting with Michael Lau, the only person ostensibly holding authority to trade in such accounts, for the last twelve months that the accounts were traded at Richardson. (ML, Tr. 195, 2893). However, Michael Lau does admit to speaking to Wu on the average of once a week during this time. (ML, Tr. 2893).

The Laus contend that Richardson quashed its own investigation of the complaint of Mui–Hin Lau and Hoh Sih Fong by having the President, Mr. Lewis, conduct it himself. (Lindh, Tr. 2976–79, 3018–19; Ex. JJJ JJJ–8 Lewis p. 220). This court is not convinced that having Richardson's President conduct an inquiry amounted to "quashing" it.

III. Are the Laus Equitably Estopped from Disavowing the Trades in Question?

 Closely allied to the doctrine of ratification is that of estoppel. In certain situations, the customer may be estopped from disavowing unauthorized trading. When there is a dispute over the authority of an agent to order trades for a principal, if the principal acted so as to lead the broker to believe that the agent had authority, that principal may be estopped from denying the trades on grounds of lack of authority. However, there is a duty on the part of the broker to investigate reasonably so as to assure itself that the agent does have authority. "A party urging estoppel must show that it took reasonable steps to discover relevant facts." *Drexel Burnham Lambert v. Commodity Futures Trading Com.*, 850 F.2d 742, 751 (D.C.Cir.1988).

Here, plaintiff's estoppel claim is based on forgeries by the Lau brother defendants of the signatures of the elder Laus as well as the Lau brothers improper use of uncle Wing Lau's certificate of deposit in the bank which was under Daniel Lau's control to pay off all the prior deficits in the Lau accounts.

Ishmael met with Daniel Lau and Michael Lau in the summer of 1984 in an attempt to collect the deficit in the Lau family accounts. (Ishmael, Tr. 1272).

On or about Aug. 9, 1984 Lindh and Hirai met with all the Laus at Michael Lau's home. (Lindh, Tr. 2969–70). Lindh was told during this meeting that neither Mui–Hin Lau nor Hoh Sih Fong ever opened an account at Richardson and that someone at Richardson had permitted the opening of three accounts in the names of people who never authorized the account openings. (Lindh, Tr. 2974). Mui–Hin Lau showed his certificate of identification from Hong Kong which bore his signature to show that he did not personally sign Richardson's account opening forms. (MHL, Tr. 1629–30).

Thus, the Lau brothers have ratified the trades done in the Lau family accounts. In addition, by failing to protest or express any curiosity at all about the family accounts, the elder Laus are held to have ratified the trades done in their accounts. The elder Laus met with Wu and visited her on the COMEX floor while the accounts were being traded at Richardson. They cannot now disavow the trades as they had more than ample opportunity to investigate and do so before; instead they sat on their rights.

The Laus were in possession of all material facts about the trading and there were no material facts hidden from them. The court finds that the Laus' protestations of fraud ring hollow. The Laus may regret entering the commodities arena and losing money, but they cannot convert this regret to a cause of action based on fraud. As the Laus well knew, commodities trading could be very lucrative but it also carries with it inherent and explicit risks; they cannot now complain if these risks eventuated in losses in their accounts. If they wanted to complain, they had ample opportunity to do so years ago. Instead, they paid all the margin deficits in their accounts.

IV. The Laus are Equitably Estopped from Recovering on Their Counterclaims and, Even if They Were Not, Have Failed to Satisfy the Relevant Burdens of Proof that Apply to those Counterclaims.

■ The Laus are equitably estopped from recovering on their counterclaims. In the first place the moneys lost were not their own but belonged instead to Wing Sang Lau, the uncle of Michael and Daniel Lau. Thus, they lack the standing to complain about the losses they sustained, even assuming that the trades in question were unauthorized.

In their Proposed Findings of Fact in the Joint Pretrial Order, the Laus asserted that the margin calls in the family accounts were met by Michael borrowing money from United Orient Bank, where he was an officer. Michael borrowed the money by pledging as security for the loan a $2,000,000 certificate of deposit over which Daniel Lau had power of attorney. This certificate was owned by Wing Sang Lau. (Defendants' Proposed Findings of Fact 74). Wing Sang Lau had no knowledge of the fact that his certificate was used in the above manner. (Defendants' Proposed Finding of Fact 75).

Testimony and evidence adduced at trial bore out these contentions. (DL, Tr. 107–11, 2663; Ex. SSSS–3A). The certificate was not intended by Wing Sang Lau to be used in the manner which the Lau brothers used it. Instead, it was supposed to support the bank (DL, Tr. 107–109) and was used without the uncle's permission or knowledge. (DL, Tr. 106).

The result was that Wing Sang Lau's entire $2,000,000 was siphoned by Daniel and Michael Lau to pay the margin calls on the Lau commodity accounts. (DL, Tr. 106–107; 116). The money lost was in effect Wing Sang Lau's. He is not a party in this action. Thus the defendant Lau brothers cannot assert that they, as the virtual thieves of these funds, have standing to seek their recovery. Richardson cannot be held responsible because fluctuations in the commodities markets led to the Laus losing the money that the Lau brothers effectively stole.

The money derived from Wing Sang's certificate was not, as defendants contend, merely "borrowed" but was instead improperly converted to Michael and Daniel's use. The Lau brothers apparently thought that no one would ever find out that they had taken this money if the commodity trading in the Lau accounts had shown a profit. Daniel Lau testified that when he took his uncle's funds, he thought to himself: "this is for a

temporary basis, and I will pay it back as the market will rebound later." (DL, Tr. 122). Hoping that the market would recover, he never told his uncle of the wrongful conversion of his funds.

Michael Lau argued that somehow he was completely unaware of the fact that the money being used to pay the margin payments on the commodity accounts came from the money pledged by his uncle to support the bank. (ML, Tr. 160). This court finds defendants' contention that the money was a loan is not supported in the evidence.

The Laus' counterclaims fail as they have not met their burden of proof in regard to these counterclaims, all of which revolve around the alleged fraudulent scheme of Wu and Richardson. Thus, even if the court did not find the trades in the Lau accounts either supported by the doctrine of apparent authority or ratified by the Laus, and even if the Laus were not equitably estopped from recovering on their counterclaims because the money lost was stolen in the first place, the court would still find against them on the grounds that the Laus have failed to sustain the burden of proof necessary to establish the elements of their various counterclaims.

## The Claim Under the Commodities Exchange Act

There has been some confusion as to whether or not the Laus' counterclaim for misrepresentation or fraud under the Commodities Exchange Act (CEA) is time-barred by the applicable statute of limitation. Both parties agree that the date from which the statute of limitation is measured was July 2, 1986. Richardson agreed to waive its statute of limitation defense for causes of action that were timely as of July 2, 1986, the date when the Laus filed as a separate lawsuit what are now denominated as counterclaims in this action. The counterclaims of the Laus were allowed as such in the instant action with the representation of Richardson that it would not raise a statute of limitation defense as to the counterclaims that were timely as of July 2, 1986. (See Defendants' and Third–Party Plaintiffs' Post–Trial Memorandum of Law at 26; Plaintiff's Post–Trial Memorandum of Law at 21).

The statute of limitations for actions under the CEA is two years after the date that the cause of action accrued. 7 U.S.C. § 25(c). The Laus claim that they could not have learned of Richardson's alleged misrepresentation or fraud under a provision of the CEA until sometime in 1988–89, at which time discovery in this action failed to uncover certain documents, specifically certain order tickets that could not be located by Richardson. (Defendants' and Third–Party Plaintiff's Post–Trial Memorandum of Law at 27). The court finds this claim rather curious. If the Laus could not have been aware of misrepresentation or fraud on the part of Richardson as to the order tickets until 1988–89, why then did they file suit alleging misrepresentation or fraud years earlier? Nevertheless, the court need not address the issue of the time at which the Laus should have known of Richardson's alleged misrepresentation or fraud. The court finds, in any event, that the Laus have completely failed to carry their burdens of proof as to either misrepresentation or fraud under the CEA. The Laus lose on the fraud and misrepresentation claims arising under the CEA even if they can show that their claims are not barred by the applicable statute of limitations.

The antifraud provisions of the CEA are "relatively unexplored." *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 106 (2d Cir.1986). Title 7 U.S.C. § 6b prohibits material misrepresentations. In order to prove a claim of misrepresentation under § 6b the Laus were required to prove each of the three following essential elements of that claim: (1) a misrepresentation (2) which is material (3) upon which plaintiff reasonably relied, and (4) the misrepresentation proximately caused the injury suffered for which plaintiff seeks recompense. In order to prove a claim of misrepresentation under the CEA the plaintiff must prove, by a fair preponderance of the credible evidence, each of the four essential elements of that claim. *Saxe*, 789 F.2d at 109–111.

The Laus' claim under the CEA is that Wu misrepresented herself as "more than an ordinary account executive." (Defendants' Post Trial Memorandum of Law at 5). How-

ever, the court finds that the Laus have failed to prove this contention by a fair preponderance of the credible evidence. The court finds that Wu did not misrepresent her position when she said that she would be on the floor of the Exchange when employed by Richardson thus making it easier and faster for her to conduct trades. The court also finds that even assuming, arguendo, that she did misrepresent her position, the Laus have failed to prove that they relied on this alleged misrepresentation or that such reliance would have been reasonable. Most damaging to the Laus' CEA claim, however, is that they completely failed to prove that this alleged misrepresentation *proximately caused* the damages the Laus claim they incurred. [In any event, as noted above, the court finds that defendants ratified any actions taken by Wu and Richardson, and thus cannot now seek recompense for any alleged wrongs under the CEA.]

*The Laus' Fraud Claims*

In like manner the court finds the CEA and all of the Laus other counterclaims bereft of merit with respect to fraud. Essentially, the Laus' counterclaims falter because they fail to carry their burden of proof with regard to the existence of fraud on the part of any of the third-parties' defendant under federal, state, or common law, and because they fail to prove (even assuming that third-party defendants' actions constitute fraud) that any loss of the Laus is causally related to such "fraud." See *Holmes v. S.I.P.C.*, —— U.S. ——, ——, 112 S.Ct. 1311, 1313, 117 L.Ed.2d 532, 534 (1992). The Laus have alleged much but proved little, if anything.

■ First, it should be noted that the burden of proof in alleged fraud cases under New York law is a high one; one who claims fraud must prove each element of fraud, not merely via a fair preponderance of the credible evidence but instead by clear and convincing evidence. *Leucadia Inc. v. Reliance Ins. Co.*, 864 F.2d 964, 971 (2d Cir.1988), cert. den. 490 U.S. 1107, 109 S.Ct. 3160, 104 L.Ed.2d 1023 (1989); *Citicorp Trading v. Western Oil & Refining*, 790 F.Supp 428, 435 (S.D.N.Y.1992); *Helmsley–Spear v. Westdeutsche Landesbank Girozentrale*, 692 F.Supp. 194, 203 (S.D.N.Y.1988). The Laus

allege common law fraud under New York law. The elements of a fraud claim under New York law are as follows: (1) with intent to defraud (2) a party makes a material false representation (3) the party seeking relief reasonably relied on said misrepresentation (4) which proximately caused the party seeking relief to suffer a monetary loss. *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 (2d Cir.1987). The court finds that the Laus have failed to establish each and every one of the elements of a fraud claim under the clear and convincing standard of proof required by New York law. *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 971 (2d Cir.1987); *Ajax Hardware Mfg. v. Industrial Plants Corp.*, 569 F.2d 181, 186 (2d Cir.1977). The standard of proof required of the Laus was especially lacking as to the element of reliance on any alleged misrepresentation.

*The Laus' Racketeer Influenced and Corrupt Organizations Claim*

The Laus' RICO complaint is also defective and would not have sufficed to allow the Laus to recover (even if the court found that there was no apparent authority to trade the accounts or that the Laus did not ratify the trading in their accounts). The Laus apparently intended to base their RICO complaint on an alleged scheme to defraud that Richardson and Wu devised and which the Laus then made the basis of various predicate acts of mail fraud.

■ In order to allege mail fraud under RICO, it is not a requirement that the material mailed be itself fraudulent or even misleading. See *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). The mailing may be as innocent as the mailing of a monthly statement or bill, but the mailing must be in furtherance of the scheme to defraud. *United States v. Lane*, 474 U.S. 438, 451–453, 106 S.Ct. 725, 733–34, 88 L.Ed.2d 814, 827–28 (1986). "The relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time." *Schmuck v. United States*, 489 U.S. 705, 715, 109 S.Ct. 1443, 1449, 103 L.Ed.2d 734, 745, reh. den. 490 U.S. 1076, 109 S.Ct. 2091, 104

L.Ed.2d 654 (1989). Here the Laus alleged that the mailings were themselves fraudulent. (See Defendants' and Third–Party Plaintiffs' Post–Trial Memorandum of Law at 7). They claim that Richardson misrepresented that all trades were proper when, in fact, they were not. The Laus allege that the mailings were improper in that the mailings claimed that all the trades were done in accordance with the rules governing commodities trades whereas in fact they were not conducted in accordance with the rules.

 A violation of the applicable RICO section at issue in this case, 18 U.S.C. § 1962(c), requires: (1) conduct (2) of the affairs of an enterprise engaged in interstate commerce (3) through a pattern (4) of racketeering activity (5) that proximately caused injury to the property or business of the party seeking relief. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346, 358 (1985); *United States v. Alkins*, 925 F.2d 541, 551 (2d Cir. 1991); *Reinfeld v. Riklis*, 722 F.Supp. 1077, 1081 (S.D.N.Y.1989). Most importantly, as the Laus themselves note in their Post–Trial Memorandum of Law at 15, the alleged conduct prohibited by the statute must be the proximate cause of the monetary injury to the party seeking recovery under RICO. *Holmes v. S.I.P.C.*, —— U.S. ——, ——, 112 S.Ct. 1311, 1317, 117 L.Ed.2d 532, 544 (1992); *Sedima*, 473 U.S. at 496–97, 105 S.Ct. at 3285, 87 L.Ed.2d at 358–59.

 The first problem with the Lau's RICO complaint is that the Laus failed to prove a scheme to defraud as required for mail fraud. They also failed to prove that Richardson engaged in any sort of racketeering conduct actually prohibited by RICO and as listed in the statute. They also failed to prove that Richardson engaged in any prohibited conduct at all which *caused injury* to the Laus. The Laus allege that Richardson committed mail fraud by mailing to the Laus confirmations of trades placed in their accounts along with their monthly account statements. As noted above, the mailings need not be fraudulent in a mail fraud case. They must, however, be in furtherance of a scheme or plan to defraud. *Schmuck v. United States*, 489 U.S. 705, 715, 109 S.Ct.

1443, 1449, 103 L.Ed.2d 734, 745 (1989). The Laus claim that these mailings in and of themselves were somehow fraudulent, yet as the party with the burden of proof, they have failed to substantiate these claims. The Laus claim that, "These confirmations along with the monthly statement mailed to Michael Lau and the other customers contained false representations *(See)* and failed to inform the Laus of the numerous trading abuses practiced by the third party defendant." (sic) (Defendants' and Third–Party Plaintiffs' Post–Trial Memorandum of Law at 17).

Assuming these abuses were proved, the Laus would still have to prove that withholding information about trade abuses was material to the Laus. (See, e.g., *Healey v. Chelsea Resources Ltd.*, 947 F.2d 611, 617 (2d Cir.1991). No such proof was offered to prove that the Laus would have acted differently if they had known of the abuses. In short, no material omissions of fact were proved. (See *Basic Incorporated v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194, 208–09 (1988).

Moreover, no court, and not this court, will take as proof bare assertions of fraud that refer generally to the record without indicating with any specificity where in the record are the facts that prove the alleged fraud.

Even if the Laus could have shown any mail fraud, they still failed to prove a cause of action under RICO for one salient reason. A RICO claimant must prove (and not merely allege as the Laus do) that any injury they have suffered was caused by the alleged RICO violation, proof sorely lacking here. The violation of RICO must be proven to be the proximate cause of the injury suffered. *Holmes v. S.I.P.C.*, —— U.S. ——, ——, 112 S.Ct. 1311, 1317, 117 L.Ed.2d 532, 544 (1992). This court has found that all trades were made in consultation with either Michael or Daniel Lau and that the elder Laus ratified all the trades. If anything, this court is convinced that the cause of the Laus' losses was not any misconduct by Richardson but the Laus' desire to reap a fortune from their speculation in the commodities market. This court finds that any losses they suffered can be traced to the Laus' own conduct.

*Violations of Trading Rules*

The court finds that the Laus have completely failed to prove that their counterclaims as to violations of the trading rules have a basis in either law or fact. In the first place, the Laus have failed to prove by clear and convincing evidence or even by a fair preponderance of the credible evidence that Wu traded in her own account in violation of the trading rules or to the detriment of her customers such as to amount to fraud, either by trading ahead of them or by changing order tickets or by delaying the placement of orders or by any other alleged means. There was scant evidence from which the court could infer that any of Wu's trading in her own account or for the Laus was in fact fraudulent or that it detrimentally affected the Laus.

There were repeated allegations by the Laus' counsel that improprieties were found in the order tickets made out by Wu. The Laus alleged that certain attributes of the order tickets—the differences between some tickets in their original form and the carbon copies, certain cross-outs on some tickets, the presence of different color inks on tickets—are indicia of fraudulent allocation of trades by Wu. (See, e.g. Defendants' Memorandum of Law in Reply to Plaintiff's Opposition to Defendants' Rule 52 Motion at 5–6; Defendants' Post–Trial Memorandum of Law at 12–14; Defendants' Post–Trial Proposed Findings of Fact at 59–64).

The court finds that the Laus have failed to prove their allegations that the alleged improprieties constituted violations of the trading rules or any other rules or statutes or amounted to fraud for which they are entitled to damages. There is no credible proof in the record that any behavior of Richardson or its employees in regard to the order tickets was deliberate, calculated, intentionally deceptive or amounted to fraud or to a violation of COMEX rules for which defendants would have a cause of action.

Even if there were proof of fraud or rule violations, defendants have failed to prove that such fraud or violations were the proximate cause of any losses of the Laus. The court also finds that the Laus are estopped from complaining since they ratified the trades in their accounts. However, even if the alleged improprieties regarding the order tickets were a fraud on the Laus causing them damages, the amount of harm caused the Laus by the alleged order ticket irregularities amounts to little more than $11,000. (See trial testimony of Linda Frazier, defendants' expert). In any event, as to this claim, the Laus have again failed to offer sufficient proof to entitle them to any recovery for alleged violation of trading rules.

The Laus have failed to prove that Wu's presence on the floor of the COMEX was somehow a fraud, either on them or on the market generally. At all times the Laus were aware of Wu's presence on the floor of the COMEX, especially since they all visited her on the floor. The Laus never protested any trades made by Wu from the floor on their accounts. They never proved that Wu's presence on the floor was fraudulent or detrimental.

Richardson's expert, Louis Burke, had extensive experience and familiarity with COMEX operating rules and floor procedures. He had been house counsel to the COMEX and had been present on the floor well over a thousand times. (Burke, Tr. 229, 231–32, 309–10). Mr. Burke testified that it was not unconventional for some brokers or account executives to operate from the COMEX floor wearing telephone badges. (Burke, Tr. 265–67). Burke testified that Wu's presence on the floor was not in violation of any specific COMEX rules. (Burke, Tr. 270). Indeed, Ms. Frazier, the Lau's expert witness, also testified that Wu's presence on the COMEX floor did not violate any specific COMEX rule or procedure. (Frazier, Tr. 1353, 2291, 1669).

The Laus' bare assertion that Richardson's failure to account for the original of every document produced in its business mandates an inference of fraud is unpersuasive, to say the least. The Laus have again failed to prove that the documents in question were fraudulently withheld or even that if produced they would have proved anything relevant to their claims. The conjectures of the Laus that the documents sought would have proved anything causally related to them

were just that—conjectures. The mere fact that every original document out of thousands of documents sought could not be located does not suffice to satisfy the Laus' burden of proof on their fraud counterclaims, which must be proved by clear and convincing evidence under New York law and by at least a fair preponderance of the credible evidence under RICO (*Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 491, 105 S.Ct. 3275, 3282, 87 L.Ed.2d 346, 355 (1985); *Cullen v. Margiotta,* 811 F.2d 698, 731 (2d Cir.), cert. den. 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987)) and the CEA (See *Saxe,* 789 F.2d at 109–11; *Grossman v. Citrus Associates of N.Y. Cotton Exchange,* 706 F.Supp. 221, 231 (S.D.N.Y.1989); *Feinberg v. Leighton,* 1987 WL 6147, *10, 1987 U.S.Dist. LEXIS 580, *27, Comm.Fut.L.Rep. (CCH) ¶ 23, 460 (S.D.N.Y.1987).

The Laus have failed to prove by a fair preponderance of the evidence their non-fraud claim of inadequate supervision of Wu by Richardson, or that such inadequate supervision, even if found to exist, was causally related to any losses suffered by the Laus.

There is no proof whatsoever that any harm flowed to the Laus because of any actions of third-party defendants DaBiero, Hirai, or DiGiacomo.

The Laus did not prove that they would have conducted their trading in a different manner had they known of the actions deemed by them to be fraudulent. Basically, the thrust of the counterclaims, be they fraud under the Commodities Exchange Act, RICO, or common law fraud, is that had the Laus known that they would have lost money they would not have traded. Neither would millions of other players in the market. However, lack of prescience is one of the risks associated with all economic activity. The markets' losers need to show evidence besides that of huge losses to recover, evidence sorely lacking in this case. No proof of causation is presented by defendants. The cry of fraud, standing bereft of credible evidence, will not avail the loser buffeted by the downturns of the market.

### The Laus' Remaining Counterclaims

The remaining counterclaims of the Laus, breach of contract, breach of fiduciary duty, conversion, money had and received, and negligence and gross negligence, are so unprovable that the Laus did not even bother to do more than label them seriatim and enumerate their elements. (See Laus' Post–Trial Memorandum of Law at 19–23). All of these remaining counterclaims are dismissed for lack of evidence.

### Breach of Contract

The Laus claimed that Richardson breached its contractual obligations to adhere to the applicable federal and state laws and to the rules and regulations of the COMEX. (Lau's Post–Trial Memorandum of Law at 19). Not one single citation to the record is adduced by the Laus to support this claim.

In addition, as stated above, the Laus have failed to prove by a fair preponderance of the credible evidence that Richardson violated any applicable law, rules, or regulations, so as to cause the Laus loss.

### Breach of Fiduciary Duty and Conversion

Both of the above counterclaims are premised on the allegation that Richardson obtained property of the Laus under false pretenses by transferring the Lau accounts from Bache to Richardson. (Laus' Post–Trial Memorandum of Law at 20–21). Again, these claims are strikingly bereft of any factual support whatsoever. (There are also rather limited in legal support; e.g. for the conversion claim only one case is cited by the Laus, a case having to do with the division of property after divorce, and the name of that case is misspelled). Essentially, the Laus contend that Richardson abused its fiduciary relationship vis-a-vis the Laus by wrongfully transferring the Lau accounts from Bache to Richardson. This claim is dismissed.

First of all, the court has found that the transfer from Bache to Richardson was authorized and ratified by the Laus. As an enunciation of the elements of these counterclaims indicates, the Laus have failed to carry the relevant burden of proof.

The Laus have failed to prove, by a fair preponderance of the credible evidence, that Richardson breached any fiduciary duty it may have owed the Laus thus causing them loss. As stated above, this court finds that

the Laus authorized and ratified the trading done in their accounts, and finds that the Laus' losses are traceable to their own desire for profit, not to any actionable conduct on the part of Richardson.

A constructive trust for breach of fiduciary duty, as sought by the Laus, may only be imposed if the following four elements are proved: (1) the existence of a fiduciary relationship, (2) the making of a promise, (3) a transfer in reliance on that promise, and (4) unjust enrichment. The court finds that the Laus have failed to prove breach of fiduciary duty so as to call for the imposition of a constructive trust, because they have failed to prove unjust enrichment on the part of Richardson, or even that Wu or Richardson made any false or misleading promises which induced reliance on the part of the Laus.

The Laus have failed to prove conversion. The elements of this New York common law cause of action are as follows: (1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another (3) the rightful owner makes a demand for the return of the property, and (4) the demand for the return is refused. *Heneghan v. Cap–a–Radiator Shops,* 132 Misc.2d 936, 506 N.Y.S.2d 132, 134 (Dist.Ct. 1986). Without proof that a demand has been both made and refused, this claim must be dismissed. *Matzan v. Eastman Kodak Co.,* 134 A.D.2d 863, 521 N.Y.S.2d 917, 918 (4 Dept.1987). The Laus have failed to prove by a fair preponderance of the credible evidence that they made a demand for the return of the accounts transferred from bache to Richardson and they failed to prove by a fair preponderance of the credible evidence that if they made this demand it was refused.

Also, since conversion is an equitable remedy, *In re Bergman,* 585 F.2d 1171, 1177 (2d Cir.1978), the Laus' own inequitable conduct (as detailed above) prevents them from utilizing this remedy.

The Laus alleged that the transfer of the accounts amounts to conversion because it contravened the relevant rules and regula-

tions of the COMEX and various federal and state laws. However, the Laus also contend that Richardson breached its contract by not following the applicable COMEX rules and regulations. Assertion of this contract claim acts to bar the conversion claim altogether, even assuming that the Laus had sufficiently proven its elements, due to the fact that [u]nder New York law a claim of conversion cannot be predicated on a mere breach of contract" and both remedies cannot be pursued simultaneously. *Fraser v. Doubleday & Co.,* 587 F.Supp. 1284, 1288 (S.D.N.Y.1984); *Hutton v. Klabal,* 726 F.Supp. 67, 72 (S.D.N.Y.1989); *Peters Griffin Woodward Inc. v. WCSC Inc.,* 88 A.D.2d 883, 452 N.Y.S.2d 599, 600 (1 Dept.1982). Additionally, as stated above, the court finds that the Laus have failed to prove that Richardson violated any applicable laws, rules, or regulations, so as to cause the Laus monetary loss.

*Money Had and Received*

The core elements for a claim of money had and received under New York law are (1) defendant received money belonging to plaintiff, (2) defendant benefitted from the receipt of the money, and (3) under principles of equity and good conscience defendant should not be allowed to retain the money. *Middle East Banking v. State Street Bank Int'l,* 821 F.2d 897, 906 (2d Cir.1987); *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank,* 731 F.2d 112, 125 (2d Cir.1984). Yet again not one single citation to the record is offered to bolster this counterclaim, thereby mandating its dismissal.

In any event, this court's finding that the Laus ratified the trading done in their accounts and that the Laus committed misconduct in admitting to forging the signatures of the elder Laus precludes a finding that equity and good conscience require a return of the money. In addition this court's finding that the money lost by the Laus was in fact stolen from Wing Sang Lau prevents an equitable finding on defendants' behalf on this claim. Money had and received is an equitable remedy, and the equitable bar of unclean hands clearly prevents the Laus' recovery on this claim.

■ In addition, New York law prohibits a party from simultaneously advancing both claims of conversion and money had and received at trial. *Baratta v. Kozlowski,* 94 A.D.2d 454, 464 N.Y.S.2d 803, 809–810 (2 Dept.1983); *Federal Ins. Co. v. Argitakos,* 637 F.Supp. 814, 821 (S.D.N.Y.1986). However, it is irrelevant which claim the Laus are allowed to elect, assuming that at this late date they could be allowed to do so, since both are clearly deficient in terms of proof.

### *Negligence and Gross Negligence*

For support of their negligence and gross negligence claims, the Laus cite the case of *Febesh v. Elcejay Inn Corp.,* 157 A.D.2d 102, 555 N.Y.S.2d 46 (1 Dept.1990), a decision involving a plaintiff stung by an insect while a guest at defendant's inn. Absolutely no reference to the record is made and there is no attempt made to discuss any cases involving business torts, as opposed to personal injury. Since the Laus have provided the court with no case law on business torts, and has made no reference to the record, these counterclaims are dismissed as well. Even had some such support been provided, this court would still be forced to dismiss these claims. The Laus have failed to prove the essential elements of any negligence claim, namely, that Richardson was in fact (and not merely in allegation) negligent and that this negligence proximately caused the losses suffered by the Laus. Since the court has found that the Laus themselves are responsible for their losses, no negligence-based count can stand due to the lack of provable causation between any breach by Richardson and any harm suffered by the Laus.

The court holds all the Lau defendants, except Wai Yau Chi, liable to Richardson for the deficits incurred under their account agreements and for the costs of this action and attorneys fees.

### THE LAUS' POSTTRIAL MOTIONS

The Laus made various post-trial motions for dismissal of plaintiffs' case as well as sanctions under Rule 11. In addition, the Lau's made motions under F.R.Civ.P. 26(g) for sanctions related to Richardson's alleged destruction of documents and other discovery violations. These motions are totally without merit and consist merely of rearguing the merits and history of the case from the vantage point of the Laus.

### 1. The Rule 11 Motion

■ Rule 11 of the Federal Rules of Civil Procedure (Fed.R.Civ.P) allows the court to impose a variety of sanctions upon attorneys who file frivolous or unwarranted papers. As Richardson's submissions clearly fail to merit any such sanctions, this motion is denied.

Defendants' arguments are merely presentations of their characterization of the evidence presented at trial as inalterable and obvious fact. The mere fact that defendants interpret the evidence in a different light than plaintiffs in no way imaginable dictates that defendants' interpretation is correct. Indeed, the essence of defendants' motions is not merely that they should win on trial but that the facts are so clear that they should have won before trial.

Defendants contend, for example, that "a cursory examination of the documents" in question (Defendant's Memorandum of Law in Support of Motions at 13) necessarily demonstrates that defendants' interpretation of the facts is manifestly correct. To contend is not to prove, however, and defendants' certainty and confidence is no argument at all for sanctions. If such confidence was truly warranted, then the motions should have been made eight years ago. One of the only conclusions that this court can make is that even assuming that the facts were utterly clear to defendants, they deliberately waited eight years to make this motion to vex their adversaries. Even were defendants one hundred percent correct in their interpretation of the facts, such unjustifiable dilatoriness would bar their motion under the doctrine of laches. In any event, the fact that judgment is for the plaintiffs serves as an automatic denial of defendants' Rule 11 motion.

Even were judgment not for Richardson, the fact that Judge Kram, in *Richardson Greenshields Sec. v. Lau,* 651 F.Supp. 929 (S.D.N.Y.1986), thought plaintiff's case worthy enough to merit the attachment of the Laus' assets is sufficient to dispose of the

Laus' instant motion. This court will not sanction a party for submissions which a judge in this District held were sufficiently meritorious to warrant the extreme provisional remedy of attachment.

Motions to dismiss should be made at the appropriate time, not at the close of almost 8 years of litigation. The Laus' argument that the case was clearly non-meritorious at its filing serves to bar this motion at the present time. If it was so clear then, eight years ago, why did the Laus wait until now to move thusly? In imposing sanctions under Rule 11, "the court must consider to what extent a defending party's injury could have been avoided or was self-inflicted." *Dubisky v. Owens,* 849 F.2d 1034, 1037 (7th Cir.1988).

### 2. The Discovery Sanctions

■ Defendants seek also, under F.R.Civ.P. 26(g), to sanction plaintiff for discovery abuses. Since this motion is so manifestly meritless and untimely it is denied. This motion should have been made at the appropriate time, e.g. during years of discovery or at trial, not after the conclusion of the trial. However, no such prejudice to defendants has been alleged or shown as to warrant sanctions. Even if defendants have any rights which were violated by plaintiff's behavior during discovery, no real prejudice to defendants has been alleged or proved. They are also clearly barred by the doctrine of laches from asserting these rights at the time they attempted to do so, i.e. just prior to trial. Prejudice to Richardson at this late date is clear. Therefore the court holds defendants motion to sanction Richardson insufficiently alleged or proved at trial and

barred by laches. *Majorica, S.A. v. R.H. Macy & Co., Inc.,* 762 F.2d 7, 8 (2d Cir.1985).

Judgment, therefore, will be for plaintiff Richardson Greenshields Securities as to the following:

(1) The third-party complaint of the Laus is dismissed with prejudice in its entirety.

(2) Plaintiff Richardson Greenshield's Securities is awarded damages in the amount owed to them by Michael Lau and the elder Laus under the account agreements with prejudgment interest[2] plus costs and legal fees.

(3) Richardson's claim against Wai Yau Chi is dismissed.

(4) The following amounts are awarded:

A. Against Mui–Hin Lau in the amount of $28,362.60 together with prejudgment interest computed at 9% per annum by the clerk of the court from July 31, 1984 through and including December 17, 1992, plus costs and attorneys fees.[3]

B. Against Ho Sih Fong in the amount of $62,474.96 together with prejudgment interest computed at 9% per annum by the clerk of the court from July 31, 1984 through and including December 17, 1992, plus costs and attorneys fees.

C. Against Kau–Ying Lau in the amount of $16,626.12 together with prejudgment interest computed at 9% per annum by the clerk of the court from July 31, 1984 through and including December 17, 1992, plus costs and attorneys fees.

D. Against Ying Lup (Michael) Lau in the amount of $59,748.72 together with prejudgment interest computed at 9% per an-

---

**2.** In a breach of contract claim under New York law in a diversity of citizenship case a plaintiff is entitled to an award of prejudgment interest. *Adams v. Lindblad Travel, Inc.,* 730 F.2d 89, 93 (2d Cir.1984). "The award of prejudgment interest is a substantive aspect of formulation of remedy ... and thus must be decided here with reference to New York laws." *Valle v. Joint Plumbing Industry Board,* 623 F.2d 196, 205 n. 19 (2d Cir.1980) (citations omitted); *see also Feel the Heat v. Centurion Agency,* 622 F.Supp. 273, 274 (S.D.N.Y.1985). Under New York law an award of prejudgment interest to the prevailing party on a contract claim is a matter of right. N.Y.Civ.Prac.L. & R. § 5001; *U.S. Naval Institute v. Charter Communications,* 936 F.2d 692,

698 (2d Cir.1991); *Hilord Chemical Corp. v. Ricoh Electronics,* 875 F.2d 32, 39 (2d Cir.1989). The applicable interest rate is 9% to be applied by the clerk of the court in accordance with N.Y.Civ.Prac.L. & R. § 5004.

**3.** The account agreements that were the subject of this litigation provided that costs and fees of collection and the legal fees of defending any suit arising out of the account were to be assessed against the account holder in the event that Richardson prevailed. (This provision is labeled Paragraph 5 of the Customer's Agreement; Ex. 33a, 33b, 33c, 33d, 33e).

num by the clerk of the court from July 31, 1984 through and including December 17, 1992, plus costs and attorneys fees.

(5) The request of the defendants and third-party plaintiffs for this court to make amended findings of fact in accordance with their submissions is denied.

(6) Plaintiffs are to submit an affidavit as to attorneys fees.

(7) A hearing on attorneys fees will follow.